| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br><br>DISTRICT OF NEW JERSEY | **FILED**<br>July 21, 2026<br>Jeanne A. Naughton, CLERK<br>United States Bankruptcy Court<br>Newark, NJ<br>By: _Juan Filgueiras_, Courtroom Deputy |
| In Re:<br><br><br>MATTHEW KOWALSKY,<br><br><br>Debtor. | Case No.: 24-19919 (VFP)<br><br><br><br>Chapter: 7 |
| <br><br>MEGHAN MARCOTTE,<br><br><br>Plaintiff,<br><br>v.<br><br>MATTHEW KOWALSKY,<br><br>Defendant. | <br>Adv. Pro. No.: 24-1664 (VFP)<br><br><br><br>Judge: Vincent F. Papalia |

**OPINION (I) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND (II) GRANTING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**FOR PUBLICATION**

<u>APPEARANCES</u>

**PORZIO, BROMBERG & NEWMAN**
Kelly D. Curtin, Esq., Kimberly N. Pageau, Esq.
5 Sylvan Way, Suite 110
Parsippany, New Jersey 07054
*Counsel to Plaintiff*

**AUGUST R. SOLTIS, ESQ.**
530 Ramapo Avenue
Pompton Lakes, New Jersey 07442
*Counsel to Defendant*

**HONORABLE VINCENT F. PAPALIA**
**United States Bankruptcy Judge**

### I.  INTRODUCTION

This matter is before the Court on the parties' cross-motions for summary judgment in the above-captioned adversary proceeding, which seeks a determination that any debt owed to Plaintiff by Defendant is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). Defendant seeks the opposite result, arguing (among other things) that he lacked the requisite intent under § 523(a)(6). For the reasons set forth in this Opinion, Defendant's Motion for Summary Judgment is DENIED, and Plaintiff's Cross-Motion for Summary Judgment is GRANTED.

### II.  JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012 (Standing Order 12-1), and further amended on June 6, 2025 (Standing Order 2025-2). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). In his Answer, Defendant admitted this Court's core jurisdiction to determine the dischargeability of his alleged debt to Plaintiff, but not as to any determination of damages. Dkt. No. 6 at ¶ 5. Venue is proper in this Court under 28 U.S.C. § 1408.  The Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

### III.  FACTS AND PROCEDURAL HISTORY[1]

---

[1] Unless otherwise indicated, the material facts described in this Opinion are undisputed or admitted by Defendant. *See generally* N.J. L.B.R. 7056-1. Under this Rule, any material fact not properly disputed with supporting evidence is deemed admitted.

The facts underlying Plaintiff's complaint arise out of events that occurred on the night of September 9, 2021 and into the early morning hours of September 10, 2021. Dkt. No. 43-3, ¶¶ 12-14.[2] The night began at a dinner in Hoboken, New Jersey attended by long-time acquaintances, Plaintiff, Meghan Marcotte, and Defendant, Matthew Kowalsky, along with several other friends. Dkt. No. 43-17 at 96:5-7; 97:15-18. Plaintiff and Defendant were both consuming alcohol at dinner. *Id*. at 103:15-18; Dkt. No. 46-12 at 6. After dinner, Plaintiff, Defendant, and the rest of the group visited a bar in Hoboken. Dkt No. 43-17 at 96:5-7; 97:15-18. Plaintiff was an employee of the bar but was not working on the night of September 9, 2021. *Id*. at 93:16-22; 94:2-7. Both Plaintiff and Defendant continued to consume alcohol at the bar. Dkt. No. 43-17 at 97:15-18; Dkt. No. 46-1 at 2. At approximately 2:00 a.m. on September 10th, Plaintiff and Defendant left Hoboken with another employee of the bar who had offered Plaintiff a ride home. Dkt. No. 43-3, ¶ 14; Dkt. No. 43-17 at 100:22-25; Dkt. No. 43-12 at 6. Upon arrival at Plaintiff's apartment in Jersey City, New Jersey, Defendant offered to escort Plaintiff upstairs due to her level of intoxication. Dkt. No. 43-7 at 5. Plaintiff does not recall any events that occurred after leaving the Hoboken bar. Dkt. No. 43-12 at 6.

Plaintiff woke up some time later on the morning of September 10th, unclothed, and experiencing confusion and vaginal discomfort. Dkt. No. 43-3, ¶¶ 14-16. Plaintiff became concerned that she may have been assaulted and, thereafter, visited Christ Hospital in Jersey City to undergo a sexual assault forensic exam (the "SAFE Exam"). *Id*.; Dkt. No. 43-19 at 56. As part of the exam, cervical, vaginal, and anal swabs were collected and submitted for forensic testing. Dkt. No. 43-19 at 54.

---

[2] For purposes of this Opinion, docket references are made to the corresponding entry number as they appear on the Court's electronic filing system, which may differ slightly from the banner atop each individual document.

On September 13, 2021, Plaintiff contacted the Jersey City Police Department to report the alleged assault, prompting the Special Victims Unit ("SVU") to commence an investigation on that same date. Dkt. No. 43-19 at 22-23. As part of the investigation, the New Jersey State Police Office of Forensic Sciences ("OFS") tested the cervical, vaginal, and anal swabs collected during Plaintiff's SAFE Exam. *Id*. at 54. On January 21, 2022, OFS issued a forensic serology laboratory report showing that spermatozoa were found on Plaintiff's cervical, vaginal, and anal swabs collected during the SAFE Exam. *Id*. For reasons unknown, OFS submitted only the spermatozoa from the vaginal and anal swabs for DNA testing but did not similarly submit the cervical swab. *Id*. On March 25, 2022, SVU investigators received a Combined DNA Index System ("CODIS") notification confirming that the DNA on the vaginal and anal swabs collected during the SAFE Exam matched Defendant's DNA in the CODIS System. *Id*. at 52.

On May 26, 2022, Defendant was criminally charged with aggravated sexual assault (the functional equivalent of rape) pursuant to N.J.S.A. § 2C:14-2A(7). *Id*. at 6. On November 7, 2022, Defendant plead guilty in Hudson County Superior Court to one count of criminal sexual contact in the fourth degree under N.J.S.A. § 2C:14-3(b). *Id*. at 13-18. At his Plea Hearing, which took place on November 17, 2022, Defendant affirmed under oath that he touched Plaintiff without her consent in her sexual parts for his own sexual gratification. Dkt. No. 43-14 at 13:12-22. On January 13, 2023, a Judgment of Conviction was entered against Defendant for criminal sexual contact under § 2C:14-3(b). Dkt. No. 43-19 at 19. Defendant was sentenced to two years of probation. *Id*.

On April 11, 2023, Plaintiff filed a civil lawsuit in Hudson County Superior Court against Defendant seeking monetary damages for assault and battery, negligence, and intentional infliction of emotional distress (the "State Court Action"). Dkt. No. 43-16. Discovery proceeded

4

in the State Court Action, including the deposition of Defendant taken on June 24, 2024. Dkt.
No. 43-17.

Later, on October 7, 2024, Defendant filed a petition for relief under chapter 7 of the
Bankruptcy Code, which stayed the State Court Action. On December 30, 2024, Plaintiff, acting
*pro se*, timely filed the instant adversary proceeding seeking a determination that any judgment
obtained in the State Court Action would give rise to a nondischargeable debt under 11 U.S.C §
523(a)(6), and asserting a general objection to Defendant's discharge under 11 U.S.C. § 727. Dkt.
No. 1.

On May 9, 2025, this Court entered a Joint Pre-Trial Scheduling Order which stayed
discovery on Plaintiff's § 523(a)(6) claim pending the resolution of Plaintiff's anticipated
summary judgment motion. Dkt. No. 17-1, ¶¶ 2-3. On May 14, 2025, Plaintiff filed her Motion
for Partial Summary Judgment on the dischargeability issue (the "First MSJ"). Dkt. No 19.
Defendant filed opposition to the First MSJ arguing that he lacked the requisite intent to injure
Plaintiff, as his guilty plea specifically referenced his intent to touch Plaintiff for his own sexual
gratification, rather than any intent to injure Plaintiff. Dkt. No. 20 at 6-7. Defendant also argued
that Plaintiff failed to demonstrate that she suffered any injury as a result of the criminal sexual
contact. *Id*. at 7. The evidence provided in support of the First MSJ did not include the DNA
results from the SAFE Exam or the CODIS hit.

A hearing was held on Plaintiff's First MSJ on July 1, 2025, after which this Court issued
an oral opinion granting in part and denying in part Plaintiff's First MSJ. Dkt. No. 24-1. Based
on principles of collateral estoppel, this Court granted partial summary judgment in favor of
Plaintiff, finding that by his guilty plea, Defendant admitted that he intentionally touched
Plaintiff in her sexual intimate parts without her consent and precluded further discovery on

those issues. *Id*. However, this Court also found that, on the record before it, a disputed issue of

fact existed as to whether Defendant willfully and intentionally intended to injure Plaintiff and

denied summary judgment on that issue. *Id*. Accordingly, this Court entered an Order Denying in

Part and Granting in Part Plaintiff's First MSJ on July 26, 2025 (the "July 26, 2025 Order"). Dkt.

No. 26-1. Specifically, the July 26, 2025 Order provided:

> Plaintiff's Motion for Summary Judgment is hereby GRANTED in
> part as follows:
>
> > The Court grants summary judgment as to whether the
> > Defendant intentionally touched [Plaintiff] in her sexual
> > intimate parts for the purpose of sexually gratifying the
> > Defendant (the "Intentional Sexual Touching Issue")
> > without [Plaintiff's] affirmative and freely given
> > permission (the "No Consent Issue").
> >
> > Plaintiff and Defendant are precluded from taking
> > discovery on the Intentional Sexual Touching Issue and the
> > No Consent Issue.
>
> Plaintiff's Motion for Summary Judgment is hereby DENIED in
> part as follows:
>
> > The Court denies summary judgment as to whether the
> > elements of willful and malicious injury by the Defendant
> > to [Plaintiff] or to the property of [Plaintiff] under
> > Bankruptcy Code § 523(a)(6) are satisfied.

Dkt. No. 26-1 at 2. The Court also directed the parties to proceed with discovery, as limited by

the July 26, 2025 Order. *Id*. Accordingly, the parties submitted an Amended Joint Scheduling

Order that, *inter alia,* provided that discovery would be completed by December 31, 2025. Dkt.

No. 37, ¶ 3. That Order further provided that the parties:

> consent to the Bankruptcy Court's adjudication and entry of final
> judgment on all dischargeability claims and defenses raised in this
> proceeding, except the amount of damages to which Plaintiff may
> be entitled. All such damages shall be decided in a jury trial in the
> pending Hudson County civil case of *Marcotte v. Kowalsky*,
> Docket No. L-1290-23.

Dkt. No. 37, ¶ 4. [3]

On October 30, 2025, Defendant filed a Motion seeking Partial Summary Judgment as to Plaintiff's objection to Defendant's discharge under 11 U.S.C. § 727 (the "Defendant's Partial SJM"). Dkt. No. 39. Defendant's Partial SJM was not contested by Plaintiff. The Court thus granted the Motion and dismissed that count of Plaintiff's adversary complaint. Dkt. No. 40.

Following the conclusion of discovery, Defendant filed a Motion for Summary Judgment on the § 523(a)(6) issue (the "Defendant's MSJ") and Plaintiff indicated an intent to cross-move for summary judgment. Dkt. No. 42.

Plaintiff filed her Cross-Motion for Summary Judgment (the "Cross Motion") on February 26, 2026, which Defendant opposed on March 12, 2026. Dkt. No. 43; Dkt. No. 46. Plaintiff filed a reply in support of her Cross-Motion on March 26, 2026 and Defendant filed a reply in support of his Motion on March 30, 2026. Dkt. No. 47; Dkt. No. 48.

A hearing was held on Defendant's MSJ and the Cross-Motion on April 1, 2026, after which this Court reserved decision. The Court's rulings on Defendant's MSJ and the Cross-Motion are the subject of this Opinion.

## IV.    THE PARTIES' POSITIONS

### A.  Defendant's Summary Judgment Motion

Defendant's MSJ rests principally on his misperception of this Court's ruling on the First MSJ. In Defendant's view, this Court previously determined that "intent to injure in a sexual

---

[3] Although Plaintiff has not yet obtained a civil judgment against Defendant, it is appropriate for a bankruptcy court to determine that a future judgment will be nondischargeable. *See In re Egeth*, 676 B.R. 69, 74 (Bankr. S.D.N.Y. 2026) ("courts throughout the country have noted that Congress in drafting the Bankruptcy Code could not have intended to allow a debt's dischargeability to depend on a [sic] whether an ongoing civil action has concluded by the time of a bankruptcy filing.").

assault case in New Jersey cannot be inferred and must be proven by the plaintiff" and that "the correct legal standard to determine intent to injure is set forth in the holdings of [*Geiger*] and [*Conte*]." Dkt. No. 42-2, ¶ 5. Defendant thus argues that so long as Plaintiff cannot prove a change in statutory or case law, the prior rulings of this Court are binding law of the case and entitle him to summary judgment on dischargeability. *Id*. ¶ 6.

Defendant summarized the Court's ruling on the First MSJ as "essentially" determining that Defendant's guilty plea did not require him to admit that he intended to injure Plaintiff "because the underlying statutorily defined offense of sexual touching that defendant pled guilty to did not require an intent to injure." *Id*. ¶ 4. In Defendant's view, because he has repeatedly stated that he did not intend to hurt Plaintiff, and because his guilty plea specified that he engaged in the criminal conduct for personal sexual gratification, Plaintiff cannot meet her burden to prove willful and malicious intent to injure under *Conte* and *Geiger*, and he is therefore entitled to summary judgment. *Id*. ¶ 29.

Defendant also continues to dispute whether Plaintiff suffered any injury. As to medical records provided by Plaintiff in discovery, Defendant argues that such records "simply indicate that she 'woke up with vaginal pain' and that she was 'c/o (i.e. complaining of) a swollen vagina,' both of which are purely subjective complaints." *Id*. ¶ 10. Defendant goes on to state that "[t]here is no documented evidence in [Plaintiff's] medical chart confirming any abnormal objective findings made by medical staff regarding plaintiff's vagina." *Id*. ¶ 12. Defendant also argues that there are no confirmed witnesses "who will offer confirming testimony on the issue corroborating any physical injuries observed to [Plaintiff's] body that are causally related to [Defendant's] actions." *Id*. ¶ 13.

8

Defendant further questions the psychological assessment of Plaintiff by Dr. Hasan Asif, M.D., because the narrative report (the "Asif Report") does not state "that [Defendant] intended to injure plaintiff or that [Defendant] was ever violent or abusive towards plaintiff." *Id*. ¶ 18. Defendant also points out that the Asif Report does not state that Plaintiff's "condition was caused by the acute one-time sexual assault" by Defendant. *Id*. ¶ 19. Alternatively, Defendant suggests that Plaintiff's "'chronic' condition could more likely than not have been caused by the cumulative aggregate stresses caused by all the continual and unrelenting legal battles between these two parties." *Id*.

B.  Plaintiff's Cross-Motion

Plaintiff's Cross-Motion initially addresses this Court's decision on the First MSJ in which this Court held that "under *Geiger* it may not presume 'willful and malicious intent to injure' from the Guilty Pleas alone or from generalized propositions that sexual misconduct is inherently malicious—particularly at summary judgment, where all reasonable inferences must favor the non-movant." Dkt. No. 43-2 at 2. Plaintiff specifies that on this round of summary judgment, she is not asking the Court to revisit those legal conclusions but rather, following the completion of discovery, she has now supplied additional "objective, admissible evidence that eliminates the material uncertainty concerning injury and the nature and extent of the invasion." *Id*.

Plaintiff argues that she is entitled to summary judgment because "the evidentiary record has been supplemented with further undisputed material facts. Specifically, the record shows that based on a Combined DNA Index System ("CODIS") investigative search result, Defendant's DNA matched the DNA collected from the vaginal and anal swabs during the SAFE examination." *Id*. ¶ 27. Plaintiff argues that the DNA and CODIS findings (the "DNA Evidence

Report") prove that Defendant penetrated Plaintiff, resulting in his spermatozoa being found inside of her person. *Id*. Coupled with the previous determination that Plaintiff was entitled to summary judgment on the issue of consent, Plaintiff argues that this undisputed evidence proves Defendant acted willfully. *Id*. Plaintiff argues that Defendant acted maliciously because his assault on Plaintiff was "wrongful and without just cause or excuse, and it necessarily caused injury to [Plaintiff]. The injuries suffered by [Plaintiff] were predictable and necessarily flow from the [assault]." *Id*. ¶ 28. In other words, Plaintiff argues that her injuries were substantially certain to result from Defendant's non-consensual contact with Plaintiff's sexual intimate parts based upon the admittedly unlawful nature of Defendant's conduct and the inherently harmful nature of sexual crimes generally. *Id*.

Plaintiff submits that Defendant's testimony at a pre-petition deposition taken in connection with the State Court Action, which is admissible under Federal Rule of Evidence 415, is indicative of Defendant's knowledge of the harmful nature of sexual crimes. *Id*. ¶ 43. Specifically, Plaintiff argues that Defendant's history of similar criminal sexual accusations against him "should have put him on notice that his behavior with women while drinking was likely to cause harm." *Id*. Plaintiff points out that although prior charges of sexual assault against Defendant were dropped, the Third Circuit's holding in *Johnson v. Elk Lake School Dist.*, 283 F.3d 138 (2002) makes clear that uncharged conduct is within the purview of Rule 415. Dkt. No. 43-2, ¶ 43.

Plaintiff also urges this Court to draw an adverse inference based on Defendant's repeated invocation of the Fifth Amendment at the same pre-petition deposition. *Id*. ¶ 41. Specifically, Plaintiff argues that "Defendant's refusal to deny that he penetrated [Plaintiff] in the civil context is additional indisputable evidence that he did, in fact, sexually penetrate [Plaintiff] without her

10

consent, further supporting a finding of willful and malicious conduct under 11 U.S.C. §

523(a)(6)." *Id*. ¶ 42.

As a result of the foregoing points, Plaintiff contends that her Cross-Motion should be

granted, and Defendant's MSJ must be denied. Specifically, Plaintiff argues that:

> Defendant's Motion asks this Court to accept the indefensible: that
> sexually assaulting someone solely for "personal gratification" is
> not injurious or malicious; that a victim's unconsciousness makes
> the assault less offensive; and that the absence of visible harm
> means no harm occurred. Notwithstanding that [Plaintiff] has
> documented physical and psychological harm, this position is
> offensive to law, common decency, and public policy.

*Id*. ¶ 46. Further, Plaintiff points out that "even if Plaintiff did *not* have documented physical and

psychological harm, it would not somehow make any debt dischargeable as rape is *per se*

malicious as substantial likelihood of injury is obvious to any reasonable person." *Id*. at n.5.

C.   Defendant's Reply in Support of His Motion for Summary Judgment

Defendant's reply alleges that Plaintiff's Cross-Motion "attempts to move the goalposts,

and, for the first time in this civil litigation, asserts that [Defendant] was not guilty of 'sexual

touching' but rather 'rape'" despite Defendant never testifying that he penetrated Plaintiff and

despite Plaintiff having "no memory or other credible evidence proven by documents or witness

statements that [Defendant] penetrated her vagina." Dkt. No. 46-1 at 2. Defendant argues that

Plaintiff's active involvement in "every aspect" of [Defendant's] guilty plea, and her lack of

objection to the plea agreement bars her, by the doctrine of collateral estoppel, from asserting in

this adversary proceeding that Defendant is guilty of rape.[4] *Id*. Specifically, Defendant refers to

---

[4] This Court does not have the power or jurisdiction to determine that Defendant is "guilty" of
anything. A determination by this Court that Defendant's assault constitutes a willful and
malicious injury under the discharge exception of 11 U.S.C. § 523(a)(6), whether by the act of
penetration or not, is not (and should not be construed as) a finding that Defendant is guilty of
any crime. This is because, among other reasons, the standard of proof in a dischargeability

11

N.J.S.A. 52:4b-36(o), asserting that although this section "does not confer absolute veto power upon crime victims to reject any plea agreement which may be recommended by a prosecutor," it clearly provides crime victims "the right to have the prosecutor advise the court of the consultation and the victim's position regarding the plea agreement." *Id*. at 4.

Defendant also introduces a theory as to the newly provided DNA evidence. Defendant avers that the evidence—which he argues "is only qualitative and merely identifies [Defendant's] DNA as being in Plaintiff's body"—is merely proof of "ejaculation and sperm migration into plaintiff's vagina by [Defendant's] motile spermatozoa." *Id*. at 3. It is Defendant's position that "[a] positive DNA test does not prove penetration," and that "[e]xpert forensic DNA testimony is required for [Plaintiff] to even attempt to prove penetration." *Id*. The hallmark of Defendant's "sperm migration" or "motile sperm" theory is that the DNA Evidence Report:

> only proves that some minimal amount of [Defendant's] sperm was found within plaintiff's vagina, and that [Defendant] did, in fact, commit the crime of "sexual touching" that he pled guilty to in the Hudson County Criminal court. That finding is entirely consistent with [Defendant's] ejaculation with some minimal amount of his sperm migrating, due to the inherent motility of all sperm cells, into [Plaintiff's] vagina through the sexual touching and rubbing process.

*Id*. at 14. Despite Defendant's repeated assertion that a "small amount" or "some minimal amount" of his sperm was found on the swabs, Defendant simultaneously argues that testimony of the nurse who conducted Plaintiff's SAFE Exam is required because the DNA Evidence Report is "completely silent as to the quantity of sperm that was observed on the testing swabs

---

action (preponderance of the evidence) is lower than that of a criminal action (beyond a reasonable doubt).

and found in the test results."[5] *Id*. at 12-14. Although not expressly stated, Defendant also appears to be arguing that migration was also the basis for the finding of his spermatozoa on Plaintiff's anal swab.

In support of his "sperm migration" or "motile sperm" theory, Defendant includes four exhibits comprised of screenshots of his internet search results:

1) **PlannedParenthood.com screenshot** which states that a woman can get pregnant without having sex by "partners having ejaculate or pre-ejaculate on their hands and they touch the vagina or vulva."

2) **Healthline.com screenshot** which states that "if ejaculate or pre-ejaculate come into contact with the vaginal area, though chances are small, it's possible pregnancy may occur. **Keep in mind these fluids can be transferred to the area via toys, fingers, and mouths – <u>not just penises</u>.**"

3) **Flo.Health.com** screenshot which states that "So if a partner ejaculates and some semen touches the vagina, pregnancy is possible. If an erect penis touches the vagina or vulva, **<u>precum that contains sperm</u>** can also fertilize an egg and result in pregnancy."

4) **Internet Inquiry "Can Penetration be Denied if Sperm is Found in the Vagina"** the aforesaid general internet inquiry response states that "Sperm can enter the vagina if a partner ejaculates near or on the vulva/vagina, as sperm are highly efficient swimmers and can travel into the vaginal canal…sperm can be transferred into the vagina via contaminated fingers or objects (sex toys)." **Sperm can also be transferred during "dry humping" due to "ejaculation during close bodily contact."**

*Id*. at 15 (citations omitted) (emphasis in original); 46-3 at 38-39; 46-4 at 1-2. Defendant argues that the examples provided suggest the "common sense" conclusion that "if one can get pregnant without having penile penetration one can certainly have a positive DNA test result due to a few

---

[5] Defendant is correct that the DNA Evidence Report is silent as to the quantity of sperm found on the swab—small, large, or otherwise. But that is not relevant to the Court's decision. What is relevant is that sperm was found on vaginal, anal, and cervical swabs taken from Plaintiff's body hours after the unlawful contact, with the vaginal and anal swab matching Defendant's DNA.

sperm cells migrating into and swimming through the vaginal canal, which is precisely what occurred in this case." *Id*. Again, none of these arguments appear to directly address the positive DNA results for the anal swab.

Defendant's ultimate argument, though, is that the DNA evidence cannot be considered by this Court because the report including such evidence is inadmissible hearsay. *Id*. at 16-17. Defendant argues that testimony from the nurse who conducted the SAFE Exam is required as to:

> whether the sample swabs were collected from the vagina and/or the cervix, which sample yielded the positive results, and a quantification of each result because spermatozoa found on a cervical swab is arguably more significant than a vaginal swab finding because the cervix is an internal structure which requires penetration to reach.

*Id*. at 13-14.[6] Notably, Defendant does not provide expert testimony—by way of affidavit, certification, or otherwise—in support of his "sperm migration" theory.

Defendant also renews his lack of injury argument, stating that "plaintiff did not sustain any discernable or definable injuries that were caused by [Defendant] and, if she did, those injuries were certainly *de minimis*, inconsequential and caused in substantial part by [Plaintiff's] own reckless conduct on the night at issue." *Id*. at 3-4. Defendant bases this argument partly on a physical assessment conducted during the SAFE Examination, which he alleges "notes absolutely no injuries or abnormalities to plaintiff's vagina." *Id*. at 17. In further support of this claim, Defendant puts forth several examples of what he refers to as "post-incident reckless

---

[6] It is important to point out here that even though Defendant's spermatozoa were found on the vaginal and anal swabs—facts Defendant does not dispute—the cervical swab was not tested for DNA. While the presence of Defendant's DNA on the vaginal and anal swabs may prompt a fair or even essentially compulsory conclusion that the DNA on the cervical swab would also positively identify the Defendant, this cannot be said with complete certainty. Thus, this Opinion does not reach the issue of whether the spermatozoa found on the cervical swab is that of the Defendant.

behavior" including (but not limited to) Plaintiff drinking, partying, dancing "scantily clad," and posting on social media. *Id*. at 28. In Defendant's view, these examples of post-incident conduct are evidence that Plaintiff was not harmed by Defendant's conduct on the night of the assault. *Id*. at 28-29.

### D. Plaintiff's Reply in Support of Her Cross-Motion

Plaintiff argues that the case "begins and ends with two undisputed facts." Dkt. No. 47 at 2. First, that Defendant plead guilty to criminal sexual contact, "admitting under oath that he intentionally touched [Plaintiff's] intimate parts without her consent" and, second, that "spermatozoa was found on cervical, vaginal, and anal swabs collected during [Plaintiff's] forensic sexual assault examination at Christ Hospital the morning after the assault." *Id*. Plaintiff argues that Defendant's "sperm migration" or "motile sperm" theories are nothing more than theories, which do not constitute a factual dispute. *Id*. Plaintiff avers that "Rule 56 does not require a trial whenever a litigant can imagine an alternative story untethered to admissible proof. It requires a genuine dispute grounded in the record, and Defendant has not produced one." *Id*.

Plaintiff also argues that collateral estoppel simply does not apply to her with regard to Defendant's guilty plea because she was not a party to the State of New Jersey's criminal action against Defendant. *Id*. ¶¶ 1-2. Plaintiff further responds that the DNA Evidence Report is not hearsay and falls within Federal Rule of Evidence 803(8) which "provides that records of a public office setting out 'factual findings from a legally authorized investigation' are not excluded by the hearsay rule." *Id*. ¶ 5. Plaintiff additionally argues that even if the Defendant's "sperm migration" theory was more than a mere hypothesis designed to manufacture a genuine dispute of material fact, the admitted to act of nonconsensual sexual touching, rubbing, and

15

ejaculation onto Plaintiff's body itself constitutes a willful and malicious injury under §
523(a)(6). *Id*. ¶¶ 10-12.

Plaintiff also calls attention to the various internal inconsistencies of Defendant's
position, including (but not limited to): (1) Defendant claiming he has no memory of what
happened but then subsequently advancing a scientific theory of external ejaculation followed by
spermatozoa migration through multiple anatomical locations as "precisely what occurred in this
case;" (2) Defendant previously certifying under oath that he cannot achieve an erection after
drinking heavily, yet now arguing that he ejaculated onto Plaintiff's body such that his
spermatozoa could travel inside Plaintiff's body; (3) Defendant conceding that the cervix
requires penetration to reach yet arguing that the spermatozoa found there resulted from external
migration; (4) Defendant arguing that he has no prior convictions of nonconsensual sexual
conduct that would be sufficient to establish awareness of potential harm caused by such
conduct, yet admitting under oath that other women had made accusations of nonconsensual
sexual conduct against him, with one such accusation resulting in Defendant being temporarily
held in jail. *Id*. ¶¶ 8, 15, 17-18.

Plaintiff also addressed Defendant's argument regarding Plaintiff's failure to prove
anything beyond *de minimis* injury, pointing out that the quantum of damages is not at issue in a
§ 523(a)(6) nondischargeability proceeding.[7] *Id*. ¶ 23. Instead, Plaintiff points out that what is at
issue is whether Plaintiff was willfully and maliciously injured as the result of Defendant's
actions. *Id*. Plaintiff argues that her own conduct/intoxication is not relevant for the inquiry of

---

[7] In any event, as previously noted, the parties entered into an Amended Joint Scheduling Order
that provided, *inter alia*, that "[a]ll such damages shall be decided in a jury trial in the pending
Hudson County civil case of *Marcotte v. Kowalsky*, Docket No. L-1290-23." Dkt. No. 37, ¶ 4.

16

Defendant's intent to injure, and, similarly, her conduct post-incident is completely irrelevant to this adversary proceeding as a whole. *Id*. ¶ 25.

### V. 11 U.S.C. § 523(a)(6): WILLFUL AND MALICIOUS INJURY

Section 523(a)(6) of the Bankruptcy Code provides:

> (a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> …
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity

11 U.S.C § 523(a)(6). Put simply, under § 523(a)(6) of the Bankruptcy Code a debtor is barred from discharging any debt that arises from a willful and malicious injury to another entity or their property. However, because the overriding purpose of the Bankruptcy Code is to provide relief to debtors from the weight of oppressive indebtedness, exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors. *See In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1998). Therefore, the creditor bears the burden of demonstrating nondischargeability under § 523(a)(6), which must be proven by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991).

In the early twentieth century, the Supreme Court decided *Tinker v. Colwell*, 193 U.S. 473 (1904), which held that an award of damages for "criminal conversation" survived bankruptcy under the Bankruptcy Act of 1898's exception from discharge for "wilful and malicious injuries to the person or property of another." *Id*. at 486, 490. Specifically, the Supreme Court held that "a wilful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be

17

said to be done wilfully and maliciously, so as to come within the exception." *Id*. at 487.

Regarding the "malice" prong, the *Tinker* court adopted the "legal definition," noting that

"[m]alice, in common acceptation, means ill will against a person; but in its legal sense it means

a wrongful act, done intentionally, without just cause or excuse." *Id*. at 485-86 (internal citation

omitted). Following this reasoning, the Supreme Court found it unnecessary to hold that "every

willful act which is wrong implies malice," and instead held that acts of a certain kind may be so

malicious in nature that "personal and particular malice … need not be shown, for the law

implies that there must be malice in the very act itself." *Id*. at 489-90.

Thus, courts understood *Tinker* to stand for two propositions: one—that "willful" may

include reckless disregard of a duty, and two—that "constructive or implied malice was

sufficient to establish malice … a showing of special malice was not required." *In re Conte*, 33

F.3d 303, 306 (3d Cir. 1994) (citing *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003,

1009 (4th Cir. 1985)) (internal quotations omitted).

Some eighty years after the Bankruptcy Act, Congress enacted the Bankruptcy Reform

Act of 1978 (the "Bankruptcy Code") and the House Judiciary Committee's accompanying

Report specified that recklessness was *not* the standard. *See Conte*, 33 F.3d at 306.[8] The

Committee made clear that "willful' means deliberate or intentional" and that cases relying on

*Tinker* to apply a "reckless disregard" standard were expressly overruled. *Id*. Although the

legislative history made clear that recklessness was *not* the proper standard, it did not clarify

what was instead required. *Id*. This lack of clarity resulted in a split of authority, with courts

---

[8] *Citing* H.R. Rep. No. 595, 95th Cong., 2d Sess., at 365, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6320–21. *See also* S. Rep. No. 989, 95th Cong., 2d Sess., 79, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5864.

"divided as to whether the statute requires an intentional act that results in injury or an act with intent to cause injury." *Id*. (citing *Perkins v. Scharffe*, 817 F.2d 392, 393 (6th Cir. 1987)).

In 1994, the Third Circuit's decision in *Conte* addressed the Circuit split and summarized the two generally competing interpretations of intent to injure: some courts required that "the *purpose* of the defendant's act be to injure," while other courts required "only an intentional act that has a *high probability* of producing harm." *Conte*, 33 F.3d at 306 (emphasis added). The Third Circuit chose not to adopt either view. *Id*.

The *Conte* court rejected the conclusion that a "high probability" of producing harm was enough to prove that a debtor acted intentionally or willfully. *Id*. at 307. Specifically, the Court explained that in demanding more than recklessness for nondischargeability, Congress "required that the debtor have engaged in conduct more culpable than taking a deliberate action that had a high probability of producing harm." *Id*. *Conte* further criticized the view that a debtor was required to have acted with a "purpose" to cause injury, feeling that such view was too narrow and did not include "the possibility that if a defendant acts with the knowledge that there is a substantial certainty of causing injury, this would constitute an act with intent to cause injury." *Id*. Thus, the Court ultimately held that "the Bankruptcy Code requires at least a deliberate action that is *substantially certain* to produce harm." *Id*. at 309 (emphasis added).

Four years after *Conte*, the Supreme Court confronted the Circuit split in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), where it unanimously held that exceptions to discharge under § 523(a)(6) are limited in scope to "acts done with the actual intent to cause injury." *Id*. at 62. The Court based its holding on a plain reading of the statute, clarifying that the "word 'willful' modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely … a deliberate or intentional *act* that leads to injury." *Id*. at 61. (emphasis in

19

original). The Court explained that "the (a)(6) formulation triggers in the lawyers mind the category 'intentional torts,' as distinguished from negligent or reckless torts", and emphasized that "[i]ntentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'" *Id*. at 61-62. (citing Restatement (Second) of Torts § 8A, cmt.a, p.15 (1964)) (emphasis in original). Debts arising out of injuries inflicted recklessly or negligently, thus, do not fall within the confines of § 523(a)(6). *Id*. at 64.

Although *Geiger* made clear that neither recklessness nor negligence will suffice to satisfy the "willful" requirement of § 523(a)(6), the opinion is less clear on two remaining issues: one—whether "substantial certainty" (a phrase not explicitly referred to in the *Geiger* opinion but found within the Restatement (Second) of Torts' definition of intent) is sufficient to prove intent under the "willfulness" prong; and two—whether the "implied malice" holding of *Tinker* survives.

### A.  Substantial Certainty After *Geiger*

As noted above, the phrase "substantial certainty" does not appear in the *Geiger* opinion. Consequently, courts that previously relied on the Restatement of Torts' definition of intent remained unsure whether "substantial certainty" was still sufficient to prove willfulness under 11 U.S.C. § 523(a)(6). In an opinion decided nine years post-*Geiger*, the Third Circuit cited to *Conte* for the exact proposition that "[a] debtor's actions are willful and malicious under § 523(a)(6) 'if they either have a purpose of producing injury *or have a substantial certainty* of producing injury,'" indicating that the "substantial certainty" definition of intent remains in full

20

force and effect in this Circuit. *In re Granoff*, 250 Fed. App'x. 494, 495 (3d Cir. 2007) (emphasis added).[9]

Similarly, the Eighth Circuit, whose opinion was affirmed by the Supreme Court in *Geiger*, has also indicated that "substantial certainty" remains sufficient, post-*Geiger*, to prove intent to injure under § 523(a)(6). *See, e.g., In re Patch*, 526 F.3d 1176 (8th Cir. 2008). *Patch* made clear that the scope of willful injury under § 523(a)(6) is "not limited to circumstances in which the debtor desires to bring about the consequences of his conduct. If the debtor knows that the consequences are certain, or substantially certain, to result from his conduct, the debtor is treated as if he had, in fact, desired to produce the consequences." *Id*. at 1180 (citing *In re Geiger*, 113 F.3d 848, 852 (8th Cir. 1997), *aff'd*, 523 U.S. 57 (1998)). Other courts have held the same, on the basis that Justice Ginsburg cited favorably to § 8A of the Restatement of Torts. *See, e.g., Margulies v. Hough (In re Margulies)*, 517 B.R. 441, 452 (Bankr. S.D.N.Y. 2014) ("[a]lthough *Geiger* did not specifically incorporate the Restatement's 'substantial certainty' test, courts that have considered this issue post-*Geiger* have relied upon *Geiger*'s favorable reference to that section of the Restatement in defining intent.").

This, however, does not end the inquiry. Because *Geiger* did not make specific mention of the "substantial certainty" portion of the Restatement's definition of intent, another split in authority emerged, with lower courts divided over whether "substantial certainly" should be assessed subjectively or objectively. *See, e.g., Squarepoint Ops, LLC v. Sesum (In re Sesum)*, 662 B.R. 840, 852 (Bankr. S.D.N.Y. 2024) ("[t]here persists a 'long-standing' split amongst the circuit courts as to whether this 'substantial certainty' test should be judged objectively or

---

[9] The *Granoff* decision does not expressly cite *Geiger*, although it had been the law for more than a decade at that time.

subjectively."). However, as noted, neither *Conte* nor *Geiger* utilized any express objective or subjective test. This Court believes that the subjective/objective distinction is artificial and born of the uncertainty that emerged after *Geiger*. Nonetheless, because many other courts have focused on the distinction between subjective and objective substantial certainty, this Court will address it as well.

### B.  Subjective vs. Objective Substantial Certainty

The objective approach bases "substantial certainty" on the circumstances surrounding a debtor's deliberate injury-producing action and whether such action, viewed objectively, was "substantially certain" to cause injury. *See, e.g., In re Nason*, 654 B.R. 644, 647-48 (Bankr. D. Me. 2023). The subjective approach focuses on what the actor actually knew at the time he committed the intentional act, and whether the debtor was subjectively aware that injury was substantially certain to occur as a result of that act. *Id*.

Courts that adopt the objective approach find that a creditor need only prove that the debtor's *acts* were substantially certain to result in injury. *See e.g., In re Miller*, 156 F.3d 598, 604 (5th Cir. 1998). Courts that adopt the subjective approach to substantial certainty find that a creditor must show that the debtor himself believed injury was substantially certain to result from his conduct. *See Margulies*, 517 B.R. at 454 (citing *In re Ormsby*, 591 F.3d 1199, 1206 (9th Cir. 2010)). It is important to note, however, that the subjective approach to substantial certainty, which is "often paraphrased as requiring the debtor's belief to have been substantially certain" is instead, according to the section of the Restatement relied upon in *Geiger*, focused on "the *probability of the consequences of the act* rather than the degree of the actor's belief." *Nason*, 654 B.R. at 64 n.2. (emphasis in original).

22

Although this is a fine distinction, it is an important one. The latter understanding would prompt an inquiry into the degree of knowledge possessed by a debtor and whether that knowledge was enough to be considered "substantially certain" or not. The former understanding eliminates a potential requirement that the creditor prove a specific *level* of knowledge possessed by the debtor. An inquiry into the degree of knowledge possessed by a debtor would not only present a formidable evidentiary hurdle but would depart from the distinction between recklessness and intent articulated in *Geiger* and *Conte*, where conduct loses its intentional character if the probability of injury falls below a substantial certainty. *See Conte*, 33 F.3d at 308 (citing Restatement (second) of Torts § 8A) ("[a]s the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent and becomes mere recklessness."). Further, the following footnote in *Conte* indicates that the Third Circuit's understanding of substantial certainty tracks the former interpretation above: "[a]lthough Collier says that the act is willful if it necessarily produces harm, we presume that this is the equivalent of 'is substantially certain to produce harm.' Otherwise, no acts would meet the formulation because no act will *definitely* produce harm—all effects are probabilistic." *Conte*, 33 F.3d at 308 n.2. (emphasis in original). Evidently, the Third Circuit understood the test to be tied to the *likelihood* of the effect occurring, rather than the level of the debtor's certainty. Thus, subjective inquiry must focus on whether the debtor had knowledge that injury was *substantially certain to result* from his actions, not whether the debtor himself was substantially certain that injury would occur.

As previously noted, the Third Circuit has not yet formally addressed whether it would adopt the subjective or objective approach to substantial certainty or whether its decision in *Conte* adopts either approach (or even needs to). Bankruptcy Courts throughout the Third

Circuit—even within the same District—appear to disagree on which standard the Third Circuit

would adopt. *Compare In re Pavlovskiy*, No. 05-24125, 2007 WL 2048965, at \*1 (Bankr. D.N.J.

July 11, 2007) (holding that "[a]lthough the Third Circuit has not ruled on this issue post-

*Kawaauhau*, courts in this Circuit have concluded that the Third Circuit would in all likelihood

retain the objective approach it endorsed in *Conte*.") *with In re Benun*, 386 B.R. 59, 77 (Bankr.

D.N.J. 2008), *aff'd in part and vacated in part on different grounds, sub nom. Fuji Photo Film

Co. v. Benun*, 2008 WL 5084572 (D.N.J. Dec. 1, 2008), *aff'd, sub nom. In re Benun*, 328 F.

App'x 659 (Fed. Cir. 2009) (holding that "taking the strongest cue from *Geiger*, this court would,

if compelled, apply the subjective standard," but would allow reliance on circumstantial

evidence). Some courts opt not to choose between the two where the facts may satisfy both the

subjective and objective approaches. *See, e.g., In re Elwood*, 319 B.R. 371, 373 (Bankr. E.D. Pa.

2003).

It is the opinion of this Court that the Third Circuit would, if prompted, adopt the

nominally subjective approach as most in accord with *Geiger*—i.e., a creditor must prove that

the debtor acted deliberately with either the purpose of causing injury or knowledge that injury

was substantially certain to result from his act.[10]

### C. *Conte* Did Not Adopt an Objective or Subjective Approach

Courts within the Third Circuit that adopt the objective approach often justify that result

by stating that *Conte* endorsed an objective standard, and because *Geiger* did not expressly

overrule *Conte*, the Third Circuit would continue to apply the same objective view. *See, e.g.,*

---

[10] However, as will be explained later, an objective standard is more easily satisfied by creditors.
Thus, even if the Third Circuit were to adopt an objective approach, proof strong enough to
fulfill the subjective standard would, logically, meet an objective standard as well—leaving this
Court's ultimate result unchanged.

*Pavlovskiy*, 2007 WL 2048965, at *1. However, a close reading of *Conte* suggests otherwise: the Third Circuit, if nothing else, applied a standard of substantial certainty that aligns more closely with the subjective approach. More likely, however, the court applied neither standard, as the subjective-versus-objective divide did not emerge until after *Geiger*.

In *Conte*, the Third Circuit similarly cited the Restatement (Second) of Torts § 8A in arriving at its holding. *See Conte*, 33 F.3d at 308; *Geiger*, 523 U.S. at 61. The first excerpt reads as follows: "the word intent denotes that the actor desires to cause [the] consequences of his act, or that *he believes* that the consequences are substantially certain to result from it." *Conte*, 33 F.3d at 308 (citing Restatement (Second) of Torts § 8A (1979)) (cleaned up) (emphasis added). Significantly, the focus is on the *belief of the individual actor* as to the probability of the consequences of his actions, and *not* whether such consequences would, or should, be appreciated by the reasonable person. *Conte*'s second citation to the Restatement reads, in pertinent part: "intent is not limited to consequences which are desired. If *the actor knows* that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id*. (cleaned up) (emphasis added). Again, it is crucial that the inquiry is based on what the *actor* knows, not what the reasonable person would know in his shoes or what the objective observer would deduce from the circumstances. Thus, the Restatement (Second) and *Conte's* citations thereof indicate that, short of desire, intent requires the actor to know subjectively that harmful consequences are substantially certain to result from his actions.

The Restatement (Third) of Torts, although not available to the Third Circuit at the time it decided *Conte*, paints a clearer picture, explaining that:

> knowledge that harm is substantially certain to result is sufficient
> to show that the harm is intentional *even in the absence of a*

> *purpose to bring about that harm*. Of course, a mere showing that
> harm is substantially certain to result from the actor's conduct is
> not sufficient to prove intent; *it must also be shown that the actor
> is aware of this*. Moreover … it is not sufficient that harm will
> probably result from the actor's conduct; the outcome must be
> *substantially certain to occur.*

Restatement (Third) of Torts, § 1 cmt. c. (2010) (emphasis added). Thus, while the objective

standard may be logical in terms of its focus on the outcome, it is overbroad in that it does not

focus on the individual actor's appreciation of that outcome, which is, in this Court's view,

essential to the holdings of *Geiger* and *Conte*.

Reading *Conte* through this lens calls into doubt the idea that the Third Circuit was

adopting an objective approach (to the extent there is one). Accordingly, in this Court's view, the

courts within this Circuit that apply an objective standard on the basis that *Conte* was adopting

an objective approach (and would adopt the same approach post-*Geiger*) rest their reasoning on

uncertain ground. Further, even if this were the most likely interpretation of *Conte*, such an

interpretation ignores the possibility (or probability) that the Supreme Court in *Geiger* foreclosed

application of an objective standard (again, to the extent there is one).

### D.  An Objective Approach is Inconsistent with *Geiger*

There can be no dispute that *Geiger* explicitly rejected an interpretation of § 523(a)(6)

which would "place within the excepted category a wide range of situations in which an act is

intentional, but injury is unintended, i.e., neither desired nor in fact anticipated by the debtor."

*Geiger*, 523 U.S. at 62. If "injury is unintended" when it is "neither desired nor in fact

anticipated," it necessarily follows that injury *is* intended in either of those two circumstances—

where it is desired or anticipated. *See Id*. This is significant for a few reasons. First and foremost,

the "nor" is important. The Supreme Court's use of the disjunctive phrase "desired *nor* in fact

anticipated" acknowledges that a debtor's may intend injury even where his intent falls short of

26

desire to cause injury. *Id*. (emphasis added). Secondly, something that is "in fact" anticipated is, logically, something that is *actually* anticipated rather than something that should have been anticipated but was not or would have been anticipated by the reasonable person but was not "in fact anticipated" by the actor. *Id*. Synonyms for anticipate are "expect" or "predict." To expect, predict, or anticipate something implies a minimal level of uncertainty as to outcome. Although a person may be aware that injury is *substantially certain* to occur, that person does not know that it will occur with *complete certainty*. Thus, the phrase "in fact anticipated" may logically be synonymous with the subjective approach to substantial certainty that has emerged in lower courts post-*Geiger*.

Accordingly, this Court finds that in determining nondischargeability under § 523(a)(6), the Court must consider an individual debtor's subjective desire to cause injury *or* subjective awareness that injury is substantially certain to occur as a result of his or her acts. An objective approach would risk excepting from discharge a broader class of conduct, in contravention of the holding in *Geiger* that "strictly limit[s] the discharge exemptions under Section 523(a)(6) … to only those debts which arise from injuries that resulted from a debtor who intended the *consequences* of an act, not simply the act itself." *Picard*, 640 B.R. 545, 554 (Bankr. E.D. Pa. 2022) (internal quotation marks omitted). Ultimately, this Court finds that the subjective approach (to the extent the distinction between subjective and objective must be made) is most consistent with *Geiger* and best comports with the purpose of § 523(a)(6).

### E.  Proving Subjective Intent

Satisfying a subjective approach to substantial certainty presents a higher hurdle for the creditor than satisfying the objective approach. Indeed, under a subjective standard, merely proving "that harm [was] substantially certain to result from the actor's *conduct* is not sufficient

27

to prove intent; it must also be shown that the actor [was] aware of this." *In re Pereira*, 638 B.R. 260, 263 (Bankr. D. Mass. 2022) (citing Restatement (Third) of Torts: Phys. & Emot. Harm § 1 cmt. c (2010)) (cleaned up). Put somewhat differently, proof that the debtor's conduct was substantially certain to result in injury is insufficient; a creditor must prove that a debtor appreciated the substantial likelihood of that result. *See, e.g., Picard*, 640 B.R. at 554 ("[g]enerally a debtor must be subjectively aware that his or her actions are substantially certain to cause injury or have been willfully blind to the substantial certainty of harm from his or her actions."). *Picard*, 640 B.R. at 554 (cleaned up).

Although an "alleged tortfeasor's subjective intent or belief can be determined from direct evidence such as a confession," it is at least unlikely that an individual would be freely willing to admit that he intended to injure his victim. *Nason*, 654 B.R. at 648. Thus, "the court need not simply take the debtor's word for his state of mind." *Benun*, 386 B.R. at 77 (citing *In re Su*, 290 F.3d 1140, 1146 n.6 (9th Cir. 2002)) (internal quotations omitted). Rather, "in addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury producing action." *Id*.

In sum, short of the debtor's direct confession of his desire to cause injury, to satisfy the willful prong of § 523(a)(6), a creditor must prove that the debtor was subjectively aware that his conduct was at least substantially certain to result in injury. This proof may come in the form of direct evidence, such as a confession, or indirect circumstantial evidence that establishes what the debtor must have known despite his potential resistance to admit to such knowledge.

F. Implied Malice

28

In the Third Circuit, "willful" and "malicious" are generally required to be examined as distinct elements. *See, e.g., Picard*, 640 B.R. at 554 (collecting cases). However, the *Geiger* Court focused almost exclusively on the "willful" prong, and its criticism of the *Tinker* decision did not appear to reach *Tinker*'s holding that a finding of implied malice is enough to meet the standard of § 523(a)(6). *See Geiger*, 523 U.S. at 62. In fact, the Supreme Court expressly "confined" its overruling of *Tinker* to the willful prong, which many courts have presumed leaves intact *Tinker*'s holding that malice may be implied in appropriate circumstances. *See Id*.; *see also Conte*, 33 F.3d at 308 (citing *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1009 (4th Cir. 1985)) (cleaned up). As noted above, the Supreme Court in *Tinker* held that for purposes of nondischargeability, the "legal definition" of malice shall apply, requiring "a wrongful act, done intentionally, without just cause or excuse," and that acts of a certain kind may be so malicious in nature that "personal and particular malice … need not be shown, for the law implies that there must be malice in the very act itself." *Tinker*, 193 U.S. at 486-89.

In *Conte*, the Third Circuit recognized that "[t]o require specific malice or some other strict standard of malice for non-dischargeability of a debt … would undermine the purposes of [§ 523(a)(6)] and place a nearly impossible burden on a creditor who wishes to show that a debtor intended to do him harm." *Conte*, 33 F.3d at 308 (citing *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d at 1009-10) (internal quotations omitted). Requiring a showing of specific malice "would restrict 523(a)(6) to the small set of cases where the debtor was foolhardy enough to make some plainly malevolent utterance expressing his intent to injure his creditor." *Id*. Thus, malice may be implied where the act is done intentionally without just cause or excuse.

G.  Injury Specifically

29

A creditor seeking a determination that debt is nondischargeable under § 523(a)(6) not only must establish that the debtor intended the act and the harmful consequences, but also that an injury occurred. Indeed, to determine the applicability of § 523(a)(6), courts must first "determine exactly what injury the debt is for, and then determine whether the debtor both willfully and maliciously caused that injury." *In re Luebbert*, 987 F.3d 771, 780 (8th Cir. 2021) (citing *Patch*, 526 F.3d at 1181) (internal quotations omitted)).

As the Eighth Circuit explained in *Luebbert*, to prove injury there must be proof of "a deliberate or intentional invasion of the legal rights of another." *Id*. *Luebbert*'s definition of "injury" tracks the Restatement (Second) of Torts' definition of injury, which specifies that the word injury "denote[s] the invasion of any legally protected interest of another." *See* Restatement (Second) of Torts § 7 (1965). In other words, "[t]he intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Rather, it is an intent to bring about a result which will invade the interests of another in a way the law forbids." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 8 at 33 (5th ed. 1984).[11]

However, "[n]ot all consequences of voluntary acts qualify as injuries—even when the consequences are harmful." *In re Fenstermaker*, 676 B.R. 225, 245 (Bankr. D. Me. 2025); *see also* Restatement (Second) of Torts § 7 (1965) (distinguishing "injury" and "harm"). Although "injury" is not defined in the Bankruptcy Code, it is "understood to mean 'a violation of another's legal right, for which the law provides a remedy,'" whereas harm "implies a loss or detriment to a person, and not a mere change or alteration in some physical person, object or

---

[11] The Supreme Court's explanation that "the (a)(6) formulation triggers in the lawyer's mind the category [of] 'intentional torts,'" at least indicates that the tort definition of injury is controlling. *Geiger*, 523 U.S. at 61.

thing." *Fenstermaker*, 676 B.R. 225 at 245 (citing *First Weber Grp., Inc., v. Horsfall*, 738 F.3d

767, 774 (7th Cir. 2013)); Restatement (Second) of Torts § 7, cmt. b. (1965).

While it is true that "the most usual form of injury is the infliction of some harm," it is

also true that "the mere apprehension of an intentional and immediate bodily contact, whether

harmful or merely offensive, is as much an 'injury' as a blow which breaks an arm." Restatement

(Second) of Torts § 7, cmt. a. (1965).[12] Thus, to prove injury for the purposes of

nondischargeability under § 523(a)(6), a creditor is required to prove that the debtor intentionally

invaded his or her rights in a manner forbidden by law.

## VI.   OTHER APPLICABLE LAW

### A.   Summary Judgment Standard

Both parties are moving for summary judgment under Federal Rule of Bankruptcy

Procedure 7056, which incorporates Rule 56 of the Federal Rules of Civil Procedure. Summary

judgment is proper when, viewing the evidence in the light most favorable to the non-moving

party and drawing all reasonable inferences in favor of the non-moving party, there exists no

genuine issue of material fact and the moving party is thus entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if the evidence is such that a reasonable

factfinder could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby*, 477

U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the

governing law." *Id.* However, factual disputes in the record that are irrelevant or unnecessary will

not preclude summary judgment. *Id.*

---

[12] While the manifestation of harm (mental or physical) may be further evidence of injury, no such manifestation is necessarily required to prove injury.

31

The Third Circuit has made clear that the well-known summary judgment standard "does not change when the issue is presented in the context of cross-motions." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Applemans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987). When both parties move for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016). Under subsection (c)(3) of Rule 56, in deciding each motion, the Court "need only consider the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Although reasonable inferences must be drawn in favor of the non-moving party, "bald assertions, without any supporting facts, cannot overcome a motion for summary judgment … [n]or is the Court required to give the non-moving [party] the benefit of unreasonable inferences." *Springs v. Prime Care Med., Inc.*, No. 15-2684, 2016 WL 1660597 at *5 (E.D. Pa. Apr. 27, 2016) (citing *Pertuzzi's IGA Supermarkets, Inc., v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993); *GFL Advantage Fund, Ltd., v. Colkitt*, 272 F.3d 189, 210-11 (3d Cir. 2001)).

Where, as here, intent is an essential element of the claim, "it is less fashionable to grant summary judgment because a party's state of mind is inherently a question of fact which turns on credibility." *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991). However, "[t]his is not to say that the court can never enter summary judgment when intent or state of mind is at issue, only that the court must recognize that undermining the moving party's professed state of mind is not a simple task." *Id*. at 1266. In fact, summary judgment may be appropriate on the issue of intent "when the evidence is so one sided that reasonable minds could not differ as to

32

the only rational outcome." *Nurick v. Burke (In re Burke)*, 523 B.R. 765, 770 (Bankr. E.D. Pa. 2015 (citing cases) (cleaned up)); *see also, Patch*, 526 F.3d at 1180 ("[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B.  Adverse Inference Based on the Fifth Amendment on Summary Judgment

Plaintiff seeks an adverse inference against Defendant due to the repeated invocation of his Fifth Amendment right against self-incrimination at his deposition in the State Court Action. Dkt. No. 43-1 at 21. Indeed, "[i]nvocation of one's Fifth Amendment privilege in civil cases, either in depositions or at trial, permits an adverse inference to be drawn against the party invoking the privilege." *SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d 505, 525 (D.N.J. 1999) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). However, while it is true that the Court "may make an adverse inference where a party invokes the Fifth Amendment in civil cases, such an inference is only appropriate where there is 'sufficient independent evidence—besides the mere invocation of the [Fifth Amendment] privilege—upon which to base the negative inference.'" *Barasky v. Dent*, 2025 WL3678888 at *8 (M.D. Pa. Dec. 18, 2025) (citing *United States v. Loc. 560 of Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 780 F.2d 267, 292 n.32 (3d Cir. 1985)).

Additionally, there is a split of authority regarding the propriety of making an adverse inference at the summary judgment stage. *Compare In re WorldCom*, *Inc.*, 377 B.R. 77, 109 (Bankr. S.D.N.Y. 2007) ("it must be remembered that at summary judgment, the Court is required to draw all reasonable inferences in favor of the non-moving party, despite potential for the ultimate trier of fact to draw an adverse inference from the assertion of Fifth Amendment

33

privileges."); *with In re Vrusho*, 321 B.R. 607, 612 (Bankr. D.N.H. 2005) ("[w]hen a party to civil actions refuses to provide discovery invoking its Fifth Amendment privilege against self-incrimination, a negative inference may be drawn at the summary judgment stage as well as trial.").

### C.  Admissibility of Defendant's Prior Allegations of Assault

Plaintiff argues that this Court may properly consider allegations of previous sexual misconduct made by other women against Defendant under Federal Rule of Evidence 415. Dkt. No. 43-2, ¶ 43.  Rule 415 provides, by internal reference to Rule 413, that in a civil case seeking relief based on a party's alleged sexual assault, evidence that the party committed any other sexual assault "may be considered on any matter to which it is relevant." *See* Fed. R. Evid. 415; 413.[13]

Federal Rule of Evidence 413(d) provides the definition of "sexual assault" for purposes of Rule 415:

> In this rule and Rule 415 "sexual assault" means a crime under federal law or under state law … involving:
>
> > (1) any conduct prohibited by 18 U.S.C. chapter 109A;
> >
> > (2) contact, without consent, between any part of the defendant's body – or an object – and another person's genitals or anus;
> >
> > (3) contact, without consent, between the defendant's genitals or anus and any part of another person's body;
> >
> > (4) deriving sexual pleasure or gratification from inflicting death, bodily injury, or physical pain on another person; or
> >
> > (5) an attempt or conspiracy to engage in conduct described in subparagraphs (1)-(4).

---

[13] Rules 413-15 were "adopted by Congress as part of the Violent Crime Control and Law Enforcement Act of 1994" and "establish[ed] exceptions to the general prohibition on character evidence in cases involving sexual assault." *Johnson v. Elk Lake School Dist.*, 283 F.3d 138, 150-51 (3d Cir. 2002).

Fed. R. Evid. 413(b). This language is, arguably, ambiguous as to whether a conviction is required for the rule to apply. However, "the legislative history of Rules 413-15 indicates that Congress intended to allow admission not only of prior convictions for sexual offenses, but also of uncharged conduct." *Johnson*, 283 F.3d at 151-52 (citing 140 Cong. Rec. 23, 603 (1994) (Statement of Rep. Molinari) ("The practical effect of the new rules is to put evidence of *uncharged offenses* in sexual assault and child molestation cases on the same footing as other types of relevant evidence that are not subject to special exclusionary rule.") (emphasis in original).[14]

Such allegations of prior sexual misconduct, however, may more properly be admitted against Defendant in this matter pursuant to the explicitly permitted uses of "prior bad act" evidence under Rule 404(b)(2). Fed. R. Evid. 404(b)(2). Specifically, Federal Rule of Evidence 404(b)(2) permits evidence of other crimes, wrongs, or acts for purposes such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of

---

[14] In *Johnson*, the Third Circuit also addressed what limits, if any, should be placed on the admissibility of uncharged conduct. *Johnson*, 283 F.3d at 152. Ultimately the Court determined that the Supreme Court's holding in *Huddleston v. United States*, 485 U.S. 681, 689 (1988), which dealt with the same issue in the context of Federal Rule of Evidence 404(b), was instructive on this point. *Johnson*, 283 F.3d at 152. In *Huddleston*, the Supreme Court "identified Rule 104(b), which governs the relevancy of evidence conditioned on fact, as the applicable safeguard against the risk of introducing prejudicial unsubstantiated evidence." *Johnson*, 283 F.3d at 152. Thus, the Third Circuit held that under Rule 104(b), a court deciding whether to admit such evidence under Rule 415 must determine whether a reasonable jury could find "by a preponderance of the evidence that the past act was an 'offense of sexual assault' under Rule 413(d)'s definition and that it was committed by the defendant." *Id*. at 154-55. That said, the danger of admitting potentially prejudicial evidence is greatly reduced, if not non-existent, in the context of a bench trial. *See Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981) (judges acting as factfinders are "trained to recognize and to exclude those matters which the rules of evidence require be discarded.")

accident." *Id*. Thus, even if Defendant's conduct does not meet the definition of "sexual assault"

in Rule 415, it may be admitted under 404(b)(2) so long as the purpose of the admission is for an

expressly permitted use and not to prove Defendant's propensity to commit a similar act, which

is prohibited by 404(b)(1).

### D.   Admissibility of the DNA Evidence Report

Federal Rule of Evidence 803 provides for exceptions to the rule against hearsay,

regardless of declarant's availability as a witness. *See* Fed. R. Evid. 803. Under Rule 803(8), a

record or statement of a public office is not hearsay if:

> (A)  it sets out:
>   (i)    the office's activities;
>   (ii)   a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>   (iii)  in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
> (B)  the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8).

As to admissibility, the Third Circuit has made clear that "official reports are admitted

under Rule 803(8), because they are presumed to be generally reliable. The party challenging the

validity of an official report admitted under this rule must therefore come forward with some

evidence which would impugn its trustworthiness." *In re Complaint of Munyan*, 143 F.R.D. 560,

563 (D.N.J. 1992) (citing *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1316 (3d

Cir. 1978)). In fact, "public reports are *presumed admissible* in the first instance and the party

opposing their introduction bears the burden of coming forward with enough 'negative factors' to

persuade a court that a report should not be admitted." *In re Complaint of Nautilus Motor Tanker

Co., Ltd.*, 85 F.3d 105, 113 (3d Cir. 1996) (interpreting *Beech Aircraft Corp. v. Rainey*, 488 U.S.

153, 170 (1988)) (emphasis added). Such negative factors include the timeliness of the investigation, the skill and experience of the investigator, whether a hearing was held, and any bias that may be present in the mind of the report's preparer, with an eye toward possible future litigation. *Id*.

### E.   Admissibility of Internet Search Results

Internet websites and web postings are typically inadmissible as hearsay. *Southco, Inc. v. Fivetech Tech. Inc.*, 982 F. Supp. 2d 507, 515 (E.D. Pa. 2013) (citing *United States v. Jackson*, 208 F.3d 633, 637-38 (7th Cir. 2000)). Some courts and commentators have suggested that websites could potentially be admissible as business records under Fed. R. Evid. 803(6) or under the commercial list hearsay exception under Rule 803(17). *Id*. (collecting cases). However, "even website evidence admissible under a hearsay exception requires authentication." *Id*. (citing *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, No. 8:06-CV-223-T-MSS, 2006 WL 1320242, at *2 (M.D. Fla. May 12, 2006) ("To authenticate printouts from a website, the party proffering the evidence must produce 'some statement or affidavit from someone with knowledge [of the website]… for example [a] web master or someone else with personal knowledge would be sufficient.'")) (alterations in original).

### F.   Collateral Estoppel

Collateral estoppel (also known as issue preclusion) prohibits the relitigation of issues that have been adjudicated in a prior lawsuit. *Witkowski v. Welch*, 173 F.3d 192, 198–199 (3d Cir. 1999) (internal citations omitted). Collateral estoppel applies where: (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in

37

question. *Sibert v. Phelan*, 901 F. Supp. 183, 186 (D.N.J. 1995) (citing *Bd. of Tr. of Trucking Emp. of N. Jersey Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 505 (3d Cir. 1992)).

It is well established that the doctrine of collateral estoppel is applicable in bankruptcy nondischargeability proceedings. *See, e.g., In re Groff*, 301 B.R. 644, 647 (Bankr. D.N.J. 2003) (citing *Grogan* 498 U.S. at 284 n.11; *Brown v. Felsen*, 442 U.S. 127, 139 n.10 (1979)).[15] It is also well established that a guilty plea by a debtor/defendant is entitled to collateral estoppel effect in such proceedings. *See generally In re Summers*, 266 B.R. 292, 301 (Bankr. E.D. Pa. 2001); *see also Groff*, 301 B.R. at 647 (holding that a criminal defendant's guilty plea qualifies as actual litigation, and a judgment of conviction entered after a criminal defendant pleads guilty qualifies as a valid and final judgment for collateral estoppel purposes). Further, because criminal guilty pleas are "governed under a higher standard of proof than dischargeability … [a] [d]ebtor cannot create an issue of material fact by taking [a] position inconsistent with his prior guilty plea." *Summers*, 266 B.R. 292, 301 (Bankr. E.D. Pa. 2001) (citing *Grogan*, 498 U.S. 279; *In re Toti*, 24 F.3d 806, 809 (6th Cir. 1994)).

G. <u>Defendant's Criminal Charges</u>

---

[15] The Supreme Court's decision in *Brown v. Felsen* stood for the proposition that bankruptcy courts are "not confined to a review of the judgment and record in the prior state-court proceedings when considering the dischargeability of [a] debt," because, such confinement would take dischargeability issues "out of bankruptcy courts well suited to adjudicate them, and force those issues onto state courts concerned with other matters." *Brown*, 442 U.S. at 138-39. However, *Brown* stated that the case concerned *res judicata* only "and not the narrower principle of collateral estoppel. Whereas *res judicata* forecloses all that which might have been litigated previously, collateral estoppel treats as final only those questions actually and necessarily decided in a prior suit." *Id*. at 139 n.10. Thus, if a state court "should determine factual issues using standards identical to those of [§ 523(a)(6)], then collateral estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues in the bankruptcy court." *Id*.

Defendant was originally charged with aggravated sexual assault under N.J.S.A § 2C:14-2A(7) which provides that:

> [a]n actor is guilty of aggravated sexual assault if the actor commits an act of sexual penetration with another person under any one of the following circumstances:
> …
>
> (7) The victim, at the time of sexual penetration, one whom the actor knew or should have known was:
>
> > (a) *physically helpless or incapacitated*;
> >
> > (b) intellectually or mentally incapacitated; or
> >
> > (c) had a mental disease or defect which rendered the victim temporarily or permanently incapable of understanding the distinctively sexual nature of the conduct, including, but not limited to, being incapable of providing consent, or incapable of understanding or exercising the right to refuse to engage in the conduct.

N.J.S.A. § 2C:14-2A(7) (emphasis added). Aggravated sexual assault is a crime of the first degree.

Defendant later agreed to plead guilty to the lesser charge of criminal sexual contact under N.J.S.A. § 2C:14-3(b), which provides that "[a]n actor is guilty of criminal sexual contact if he commits an act of sexual contact with the victim under any of the circumstances set forth in section 2C:14-2c(1) through (5)." N.J.S.A. § 2C:14-3(b). Subsections (2) through (5) of § 2C:14-2c are inapplicable to the instant facts as they refer to situations in which the actor and victim are, for example, related by blood, where the actor has supervisory or disciplinary power over the victim, where the actor is a parent, guardian, or stands *in loco parentis* within the victim's household, or other situations of that nature. N.J.S.A § 2C:14-2c(2)-(5). Thus, the only potentially applicable subsection which Defendant's guilty plea could be referencing is § 2C:14-2c(1), which criminalizes sexual contact by an actor "using coercion or without the victim's affirmative and freely given permission, but the victim does not sustain severe personal injury."

N.J.S.A § 2C:14-2c(1). The definitional section of the New Jersey Statute provides that sexual

contact means:

> an intentional touching by the victim or actor, either directly or
> through clothing, of the victim or actor's intimate parts for the
> purpose of degrading or humiliating the victim *or sexually
> arousing or sexually gratifying the actor.* Sexual contact of the
> actor with himself must be in the view of the victim whom the
> actor knows to be present.

N.J.S.A § 2C:14-1d (emphasis added).

In *State in Int. of M.T.S.*, 129 N.J. 422 (1992), the New Jersey Supreme Court conducted

a thorough analysis of New Jersey's criminal sexual assault statute and its 1979 modernization,

which marked the New Jersey Legislature's major departure from the rape laws that had been in

place in the state for nearly two hundred years. *M.T.S.*, 129 N.J. at 431. New Jersey's original

rape statutes can be traced back to English common law's definition of rape as "carnal

knowledge of a woman against her will" plus the supplemental requirement by American courts

"that the carnal knowledge have been forcible" which was added "apparently in order to provide

that the act was against the victim's will." *Id*. (internal citations omitted).

The application of this pre-reform rape law was problematic for many reasons. Most

notably, courts required evidence of both the withdrawal of consent and active resistance, which

was deemed insufficient "unless the woman oppose[d] the man to the utmost limit of her power."

*Id*. at 433. (internal citations omitted). In the early 1960s, the New Jersey Appellate Division

recognized that the "uttermost test" was obsolete. *Id*. (citing *State v. Harris*, 174 A.2d 645 (App.

Div. 1961)). Yet, resistance remained a required element of the crime of rape, albeit to a lesser

degree. *Id*. The Appellate Division stated that the law instead required a woman to "resist as

much as she possibly can under the circumstances." *Id*. (citing *State v. Terry*, 215 A.2d 374, 376

(App. Div. 1965)) (internal quotations omitted).

In the wake of cases like *Terry*, pressure mounted to shift the focus away from the traditional conception of rape as "the overcoming of a woman's will or the insult to her chastity." *Id*. at 437. This outdated standard harkened back to a time when rape laws were "designed to protect the property rights of men to their wives and daughters."[16] *Id*. Specifically, these "[t]raditional interpretations of force were strongly criticized for failing to acknowledge that force may be understood simply as the invasion of 'bodily integrity.'" *Id*. at 437-38. In response to these concerns (among many others), the New Jersey Legislature completely overhauled the rape statute. *Id*. The new version of the law: (1) referred to the crime as "sexual assault" instead of "rape"; (2) required "penetration," not "sexual intercourse"; (3) required "force" or "coercion" by the actor, as opposed to "submission" or "resistance" by the victim; (4) eliminated any reference to the victim's state of mind, attitude, or conduct in response to the assault; (5) eliminated the spousal exception; (6) rendered the crime gender neutral; and (7) emphasized "the assaultive character of the offense by defining sexual penetration to encompass a wide range of sexual contacts, going well beyond traditional 'carnal knowledge.'" *Id*. at 440-41.

Ultimately, this overhaul anchored the statutory scheme governing sexual offenses in traditional criminal and tort principles. In fact, the new sexual assault statute was "significantly colored by [the Legislature's] understanding of the law of assault and battery." *Id*. at 442. The "intent of the Legislature to redefine rape consistent with the law of assault and battery is further evidenced by the legislative treatment of other sexual crimes less serious than and derivative of

---

[16] Coincidentally, *Tinker* provides an example of this exact concept. The Supreme Court's holding that the judgment against Mr. Tinker for his "criminal conversation" with Mr. Colwell's wife was non-dischargeable was based, in part, on the idea that Mrs. Colwell was considered the "property of another" (her husband). *Tinker*, 193 U.S. at 480.

traditional rape" such as the crime Defendant plead guilty to—criminal sexual contact. *Id*. at 443.

The Court in *M.T.S.* made clear that:

> [t]he Code redefined the offense of criminal sexual contact to emphasize the *involuntary and personally offensive nature* of the touching…[s]exual contact is criminal under the same circumstances that render an act of sexual penetration a sexual assault, namely, when 'physical force' or 'coercion' demonstrates that it is unauthorized and offensive…[t]hus, *just as any unauthorized touching is a crime under traditional laws of assault and battery, so is any unauthorized sexual contact* a crime under the reformed law of criminal sexual contact.

*M.T.S.*, 129 N.J. at 443 (emphasis added). This idea that sexual assault crimes are corollaries to traditional assault and battery is significant. Indeed, the Third Circuit has held that "'[l]iabilities arising from assault or assault and battery are generally considered as *founded upon* a willful and malicious injury.'" *Granoff*, 250 Fed. App'x. at 495 (quoting 4 *Collier on Bankruptcy* ¶ 523.12[4] (15th ed. rev. 2007)) (emphasis added). And, as noted, the Supreme Court in *Geiger* found that the types of wrongs included within § 523(a)(6) are what lawyers traditionally consider intentional torts. *Geiger*, 523 U.S. at 61.

## VII.   ANALYSIS

### A.  Plaintiff is Not Collaterally Estopped from Alleging Penetration

At the hearing on the First MSJ, this Court held that collateral estoppel applied, based on Defendant's guilty plea, to two material issues: one—that Defendant intentionally touched Plaintiff in her sexual intimate parts for his personal gratification; and two—that the touching occurred without Plaintiff's consent. *See* Dkt. No. 24-1 at 43:14-18; 43:23-44:4. Defendant now argues that Plaintiff should be collaterally estopped from arguing that Defendant penetrated her by virtue of her "participation" in Defendant's guilty plea agreement with the State of New Jersey. *See* Dkt. No. 46-1 at 2.

42

To successfully argue that Plaintiff should be so estopped, Defendant would need to prove, *inter alia*, that Plaintiff was "a party or in privity with a party to the prior adjudication." *Sibert*, 901 F. Supp. at 186. Defendant cannot prove this because it is not so. As is evident from even the mere caption of Defendant's criminal case, the only two parties to that action were the State of New Jersey and Matthew Kowalsky.[17] Further, the Plea Form memorializing Defendant's guilty plea required the signature of only three parties: the Defendant, his Defense Attorney, and the Prosecutor. *See* Dkt. No. 43-13 at 8. Plaintiff's signature was not required on the document because her authorization was not required for the entry of Defendant's guilty plea.

In *State v. Means*, 191 N.J. 610, 618 (2007), the Supreme Court of New Jersey, considered N.J.S.A. 52:4b-36(o), the section referenced by the Defendant in support of his argument. The Court specifically cited the Attorney General's Standards to Ensure the Rights of Crime Victims for the following proposition:

> [i]t is *recommended* that prosecutors consult with every victim of violent crime, explaining how the plea negotiations process operates, what negotiating posture the prosecution has adopted and why that posture was chosen. Prosecutors should always *attempt* to take into account the victim's views before reaching a final decision. Victims legitimately view the resolution of and sentencing in a case as an evaluation of the harm done to them…*[n]othing contained herein should be construed to alter or limit the authority or discretion of the prosecutor to enter into any plea agreement which the prosecutor deems appropriate.*

*Means*, 191 N.J. at 618 (emphasis added) (citations omitted). These standards make clear that the decision to offer and enter into a plea agreement with a criminal defendant is entrusted to the authority and discretion of the prosecutor. *Id*.

---

[17] *See State of New Jersey v. Matthew J. Kowalsky*, W-2022-002127-0906 (N.J. Super. Ct. Crim. Div. Hudson Cty. Nov. 17, 2022).

Moreover, in *Means*, the trial court set aside a criminal defendant's initial plea agreement after being informed by the prosecutor that the victims were not notified of its terms. *Id*. at 612. Subsequently, the defendant entered into a second, less favorable agreement with the prosecutor. *Id*. Although the Appellate Division affirmed, the New Jersey Supreme Court ultimately reversed, holding that a trial court may not "set aside a plea agreement solely because the prosecutor failed to give notice to the victims prior to entering into the plea agreement." *Id*. at 613. If it were the case, as Defendant argues, that the victim of a crime is necessarily a party to a plea agreement, such holding would be illogical.

Defendant's collateral estoppel argument also fails as to the question of whether an identical issue was decided in the prior adjudication. By virtue of pleading guilty to the lesser charge of criminal sexual contact, the issue of whether Defendant penetrated Plaintiff was unnecessary to decide and was not decided. Similarly, because penetration was not an element of the crime Defendant plead guilty to, and because Plaintiff was not a party to Defendant's criminal case, she did not have a full and fair opportunity to litigate the issue of whether Defendant penetrated her.

In sum, because Plaintiff was not a party to the Defendant's criminal case, her agreement to Defendant's plea was not required, and she is not limited to what Defendant plead guilty to in his plea agreement in proving her nondischargeability case. *See, e.g., Doe v. Hesketh*, 828 F.3d 159, 171-72 (3d Cir. 2016) (declining to apply collateral estoppel to crime victim where she was neither a party to the criminal proceeding, nor in privity with a party, and did not have a full and fair opportunity to litigate); *see also Prudential Prop. & Cas. Ins. Co. v. Kollar*, 243 N.J. Super. 150, 155 (App. Div. 1990) ("an innocent third-party victim…should not be estopped from effectively recovering against a defendant…when the defendant, for whatever reason, elects to

44

enter a plea of guilty."). Thus, Plaintiff is not collaterally estopped from alleging or proving penetration in this proceeding.

B. Plaintiff Has Satisfied Her Burden of Proving Willful and Malicious Injury

i. The DNA Evidence Report is Admissible Under the Public Records Exception

Defendant argues that the DNA Evidence Report is inadmissible hearsay without corroborative testimony. Dkt. No. 46-1 at 13. Plaintiff counters that the DNA Evidence Report is admissible under Federal Rule of Evidence 803(8) as a public record. Dkt. No. 47, ¶ 6. Plaintiff is correct. In civil cases, a record or statement of a public office[18] is not hearsay under 803(8)(A), if it sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report; or (iii) factual findings from a legally authorized investigation. Such record is presumed admissible unless the opponent can demonstrate that the source of information or other circumstances indicate a lack of trustworthiness. *See* Fed. R. Evid. 803(8)(A)-(B).

Here, the DNA Evidence Report satisfies Rule 803(8)(A)(iii) because the DNA Evidence Report "contains factual findings from a legally authorized investigation." As a result, the DNA Evidence Report is admissible unless Defendant can prove that it is untrustworthy. *Id*. Defendant argues that testimony of the nurse who conducted the SAFE Exam is required to corroborate the findings within the report. *See* Dkt. No. 46-1 at 13-14. However, that argument ignores that the DNA Evidence Report, as a public record, is entitled to a presumption of trustworthiness. *See Nautilus* 85 F.3d at 113. To properly rebut such presumption, Defendant must produce "some evidence which would impugn its trustworthiness." *Id*. Defendant has not done so. Defendant

---

[18] The DNA Evidence Report was prepared by the New Jersey State Police Office of Forensic Sciences, a state government agency, and thus is appropriately considered under Federal Rule of Evidence 803(8). *See, e.g., Munyan*, 143 F.R.D. at 563.

merely argues that testimony is required to establish whether the swabs were collected from the

vagina and/or the cervix, to establish the quantity of sperm on each of the swabs, and to establish

which of the collected samples yielded positive results. Dkt. No. 46-1 at 13-14. These arguments

are unpersuasive for several reasons.

First and foremost, the DNA Evidence Report itself, which is presumed to be trustworthy,

establishes that three swabs were taken—vaginal, cervical, and anal—from Plaintiff's body. Dkt.

No. 43-19 at 54. The DNA Evidence Report also establishes that Defendant's DNA was found on

the vaginal and anal swabs and establishes that the cervical swab was not tested for DNA. *Id*.

While it is true that the Report did not "quantify" the results, that determination is not relevant to

this case and would not make the Report any more or less trustworthy. Ultimately, what

undoubtedly is most relevant (and is not refuted or even disputed by Defendant) is that

Defendant's DNA was found inside Plaintiff's body.

As for the *Beech* factors, Defendant has not argued untimeliness,[19] lack of skill or

experience, or possible bias. Defendant has argued only that such a report cannot be admitted

without the testimony of its preparer. *See* Dkt. No. 46-1 at 13-14. However, to exclude a public

record which otherwise falls under 803(8), Defendant must make "an affirmative showing of

untrustworthiness beyond the obvious fact that the declarant is not in court to testify." *Munyan*,

143 F.R.D. at 563 (citing *Bradford Tr. Co. v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 805 F.2d

49, 54 (2d Cir. 1986)). Defendant has not done so. Thus, the DNA Evidence Report is properly

admissible under Federal Rule of Evidence 803(8).

ii.   <u>The Internet Results Provided by Defendant in Support of his Sperm
      Migration Theory are Inadmissible Hearsay</u>

---

[19] In any event, the Report establishes that the SAFE Exam was conducted, and the swabs were
collected, on September 10, 2021—the same day the assault took place.

46

Defendant alternatively argues that the DNA Evidence Report, if properly admitted, does not prove that he penetrated Plaintiff. *See* Dkt. No. 46-1 at 14-16. Instead, Defendant offers another explanation for his spermatozoa being found inside of Plaintiff. Defendant argues that he ejaculated onto Plaintiff and "due to the inherent motility of all sperm cells," his spermatozoa migrated into Plaintiff's vagina "through the sexual touching and rubbing process." *Id*. at 14. In support of this position, Defendant cites to three websites and one general internet inquiry: (1) PlannedParenthood.com; (2) Healthline.com; (3) Flo.Health.com; and (4) Internet Inquiry: "Can Penetration be Denied if Sperm is Found in the Vagina." *Id*. at 15. These websites and postings are indisputably hearsay and may only be admitted under a proper hearsay exception such as the business records or commercial list exception. *Southco*, 982 F. Supp. 2d at 515. Defendant does not provide the Court with a basis to admit such evidence. Defendant does not acknowledge that these websites and postings are hearsay, nor does he argue that a hearsay exception should apply. Even if such websites or web postings did fit within a hearsay exception, they still would need to be authenticated by statement or affidavit from someone with personal knowledge of the website or web posting. *Id*. Defendant has not produced such a statement or affidavit. Thus, this evidence is inadmissible hearsay and cannot be considered by this Court.

In any event, even if the websites were somehow admissible, expert testimony would be required to support this type of evidence. *See McKenna v. City of Phila.*, 636 F. Supp.2d 446, 462-63 (E.D. Pa. 2009) (expert testimony is necessary where the factfinder is not "capable of comprehending the primary facts and of drawing the correct conclusions from them as [would be] witnesses possessed of special or peculiar training, experience, or observation in respect to the subject under investigation"). Discovery is now closed, and Defendant has not produced any expert or expert report on his sperm migration theory. This Court, as the factfinder, is not capable

of determining whether Defendant's sperm migration theory has any legitimacy without the assistance of an expert. Accordingly, Defendant's sperm migration theory and supporting evidence is inadmissible on this separate and independent ground as well.

In sum, whether Defendant's sperm entered Plaintiff's body by penetration or by sexual touching, rubbing and ejaculation, the Court would come to the same conclusion: that Defendant's criminal sexual contact resulted in injury to Plaintiff.[20] Defendant does not dispute that his DNA was found inside Plaintiff. While there is a potential dispute as to *how* Defendant's DNA came to be inside of Plaintiff's body, that dispute does not prevent summary judgment. In this regard, Defendant admits that he "ejaculated during his sexual touching and rubbing incident with [Plaintiff]." Dkt. No. 46-1 at 14-15. This admission independently supports a finding of injury to Plaintiff, even without penetration, as will be further explained below.

### iii.    Willful and Malicious Injury

In determining the applicability of § 523(a)(6), a court must first determine "exactly what injury the debt is for, and then determine whether the debtor both willfully and maliciously caused that injury." *Luebbert*, 987 F.3d at 780. Thus, before discussing the issue of intent, this

---

[20] Plaintiff urges the Court to make an adverse inference on the issue of penetration based on Defendant's repeated invocation of his Fifth Amendment right against self-incrimination at his State Court Deposition. Dkt. No. 43-2, ¶ 41. Defendant invoked the Fifth Amendment no less than forty-eight times during the three-hour deposition, most commonly when questioned about his alleged penetration of Plaintiff. *See generally* Dkt. No. 43-17. While some courts have held that adverse inferences may be made at summary judgment, this Court is persuaded, instead, by the reasoning of courts that hold that such an adverse inference is inappropriate on summary judgment where the non-movant is entitled to all reasonable inferences in his favor. *See WorldCom*, 377 B.R. at 108-9. In any event, unlawful penetration is not the only type of sexual injury which may be excepted from discharge under § 523(a)(6). Even if this Court were to accept Defendant's implausible and inadmissible sperm migration theory, the nonconsensual sexual touching rubbing and ejaculation onto Plaintiff's body is injurious. Therefore, the Court need not make an adverse inference against Defendant—but, if it could, that would only constitute further support for its ruling.

Court must initially discuss Plaintiff's alleged injury. Defendant spends much of his Motion and Opposition to Plaintiff's Cross-Motion discussing the alleged lack of "abnormal objective findings made by medical staff regarding plaintiff's vagina," and lack of "confirmed witnesses" who will offer testimony to corroborate "any physical injuries observed to [Plaintiff]'s body that are causally related to [Defendant]'s actions." Dkt. No. 42-2, ¶¶ 10-13. However, Defendant cites no law to suggest that "purely subjective complaints" may not serve as evidence of injury. *Id*. at 10. Defendant also cites no law to suggest that Plaintiff must provide testimony of a third-party witness to corroborate alleged physical injury.

Defendant additionally argues that the discovery provided by Plaintiff concerning her mental health is insufficient to prove that Plaintiff suffered any psychological injury because such evidence does not show that her mental condition was solely caused by Defendant's actions. *Id*. ¶¶ 18-19. Defendant also appears to argue that because Plaintiff indicated history of a prior psychophysiologic disorder on the medical history section of her emergency room chart at Christ Hospital, she was not mentally affected by Defendant's "acute one-time sexual assault." *Id*. ¶ 19. However, Defendant cites no law supporting that Plaintiff must prove her mental conditions were caused exclusively and completely by Defendant's wrongful actions. Defendant also does not cite any cases holding that the exacerbation of a previous mental condition does not constitute injury. Defendant also heavily scrutinizes Plaintiff for what he terms "post-incident reckless behavior." Dkt. No. 46-1 at 28. Yet, Defendant fails to provide any authority even suggesting that a sexual assault victim risks forfeiting a finding of injury simply by attempting to move forward with her life, or that her subsequent choices can absolve Defendant of his own independent criminal conduct.

In any event, Defendant has not accurately described what is required to prove injury under § 523(a)(6). In determining whether an injury occurred, courts have adopted the "legal definition" of injury. *Luebbert*, 987 F.3d at 779 ("the word 'injury' usually connotes legal injury") (citing *In re Geiger*, 113 F.3d 848, 852 (8th Cir. 1997) (en banc), *aff'd by Geiger*, 523 U.S. 57 (1998)). Put differently, legal injury is not limited merely to physical injury; as the Restatement (Second) of Torts explains, an injury for legal purposes is "the invasion of any legally protected interest of another." *See* Restatement (Second) of Torts § 7 (1965); *see also Luebbert*, 987 F.3d at 779 ("a willful injury is a deliberate or intentional invasion of the legal rights of another.") (emphasis omitted).

Accordingly, Plaintiff need not have suffered some terrible or irreversible physical damage to her body to prove that she was injured. Plaintiff need only prove that Defendant intended to bring about a result which invaded her interests in a way the law forbids. *Luebbert*, 987 F.3d at 779. In other words, it is sufficient that Plaintiff prove "a violation of [her] legal right, for which the law provides a remedy." *Fenstermaker*, 676 B.R. at 245. The most persuasive evidence on this point is, of course, Defendant's guilty plea and conviction for one count of criminal sexual contact in the fourth degree under N.J.S.A. § 2C:14-3(b). Thus, by virtue of his decision to plead guilty to criminal sexual contact, Defendant admitted that he violated Plaintiff's legal rights for which the law provides both criminal and civil remedies.

Defendant's arguments that Plaintiff did not suffer severe enough injury or injury of a specific kind are rejected. There is no such quantum requirement under § 523(a)(6), and the amount of any damages Plaintiff suffered was expressly left to further state court proceedings by agreement of the parties. Dkt. No. 37, ¶ 4. Additionally, this Court finds that Defendant's arguments as to Plaintiff's post-incident conduct are completely irrelevant to Plaintiff's §

50

523(a)(6) claim. Plaintiff's social life, social media, drinking habits, and career advancement simply have nothing to do with whether Defendant willfully and maliciously injured Plaintiff on September 10, 2021.

On the other hand, Defendant's decision to plead guilty to criminal sexual contact, coupled with his explicit admission that he (at least) sexually touched, rubbed, and ejaculated on Plaintiff without her consent constitutes persuasive evidence that Defendant invaded Plaintiff's legally protected interests. *See* Dkt. No. 46-1 at 14. Defendant provides no evidence to refute that he invaded Plaintiff's legally protected interest in a manner forbidden by law, and, as previously noted, Defendant may not take a position inconsistent with his guilty plea for the purpose of creating an issue of material fact. *Summers*, 266 B.R. at 301. Thus, this Court finds there to be no genuine dispute as to the material fact of Plaintiff's injury.

In sum, Defendant's intentional, nonconsensual touching of Plaintiff's sexually intimate parts, whether by penetration or by sexual touching, rubbing, and ejaculation resulting in sperm migration, constitutes injury in fact as well as injury to Plaintiff's legally protected right to be free from such unlawful contact. At the very least, the DNA Evidence Report indisputably establishes that Defendant ejaculated in or on Plaintiff. But, based on the finding of Defendant's DNA on the vaginal and anal swabs, and the lack of support for Defendant's sperm migration theory, this Court finds it more likely than not that Defendant sexually penetrated Plaintiff (i.e., that penetration was proven by a preponderance of the evidence).[21] Plaintiff is therefore entitled to summary judgment on the issue of injury.

---

[21] To be clear: the Court's decision does not hinge upon a finding that penetration likely occurred. Even accepting Defendant's account of that night, Plaintiff is likewise entitled to summary judgment. Defendant's account—that he sexually touched, rubbed, and ejaculated onto Plaintiff's body without her consent—constitutes a comparable and independent violation of personal dignity and autonomy, even absent penetration.

iv.     Intent to Commit the Act

As noted, for debt to be nondischargeable under § 523(a)(6), a debtor has to both intend

the *act* as well as intend to injure the creditor. *See generally Geiger*, 523 U.S. at 62. Here,

Defendant argues that this Court cannot find that he intended to injure Plaintiff because he

admitted, and plead guilty to, committing criminal sexual contact for his personal sexual

gratification. Defendant cannot reasonably (and does not even attempt to) argue that he did not

intend to commit the act itself, because that argument would directly contradict both his guilty

plea and the underlying basis for his arguments on summary judgment. It would be at least

inconsistent for Defendant to argue, on the one hand, that he did not intend to commit the sexual

touching, and, on the other hand, argue that he touched Plaintiff to sexually gratify himself. Thus,

there is no genuine dispute of material fact as to whether Defendant intended to engage in the

misconduct—whether it be sexual touching, rubbing and ejaculation, or penetration.

v.     Intent to Injure

As discussed at length above, intent can be proven either by evidence that the debtor

desired to cause injury to the creditor or evidence that the debtor was subjectively aware that

injury was substantially certain to occur as a result of his actions. Defendant argues that he is

entitled to summary judgment on the issue of intent because he plead guilty to touching Plaintiff

for his own personal sexual gratification.

Although Defendant admits that on the night of the assault "he was an emotionally

compromised, selfish, reckless, narcissistic, irresponsible and uncaring individual who was

solely focused on gratifying himself," he maintains that he never wanted to injure Plaintiff. Dkt

No. 46-1 at 34. At the time of his sentencing, Defendant issued a formal apology to Plaintiff,

stating that he "never meant to hurt her in any way." Dkt. No. 43-15 at 13:10-11. However,

contrary to Defendant's position, a lack of sufficient evidence disputing his *desire* to injure

Plaintiff does not entitle him to summary judgment, because intent to injure is not limited to

desire to cause injury, as the Third Circuit made clear in *Conte*. *Conte*, 33 F.3d at 306. Both

*Conte* and subsequent Third Circuit decisions have held that intent may also be proven by

evidence that a debtor was aware that his actions were substantially certain to cause injury. *See,*

*e.g., Granoff*, 250 Fed. App'x. at 495.

In any event, Plaintiff does not argue, for purposes of her Cross-Motion, that Defendant

desired to injure her. Plaintiff instead argues that the new evidence before the Court, principally

the DNA Evidence Report, proves that Defendant intentionally penetrated Plaintiff without her

consent, which entitles her to summary judgment under the objective approach adopted by the

Third Circuit. Dkt. No. 43-2, ¶ 25-27. Under the objective approach, Plaintiff explains,

nonconsensual sexual penetration plainly satisfies the willful element of § 523(a)(6) as a matter

of fact and law. *Id*. at ¶ 27. Put differently, because of the objectively wrongful nature of sexual

crimes in general, it can be inferred that someone engaging in such conduct intends to injure

their victim. However, this Court is unpersuaded by the argument that the Third Circuit adopted

an objective approach to substantial certainty after *Geiger*.[22] Accordingly, this Court finds that

Plaintiff will only be entitled to summary judgment if there is no genuine dispute of fact as to

Defendant's subjective awareness, at the time of the assault, that his conduct was substantially

certain to cause injury to Plaintiff.

---

[22] Importantly, the adoption of a subjective substantial certainty standard disposes of Defendant's law of the case argument as this Court has not previously found, and is not now finding, that intent to injure may be inferred. Instead, it is finding that subjective intent to injure may be established by both direct and circumstantial evidence that defendant was substantially certain that injury would result from his intentional actions.

Defendant's subjective awareness can be determined either from direct evidence, such as a confession, or from indirect circumstantial evidence that establishes what he must have actually known when taking the injury-producing action. *See generally, Su*, 290 F.3d at 1146; *Nason*, 654 B.R. at 648; *Benun*, 386 B.R. at 77. Defendant has not confessed that he intended to injure Plaintiff. Therefore, the Court must assess the other direct and circumstantial evidence before it to determine what Defendant actually knew on the night of the assault. *Id*. In this Court's view, the following evidence, coupled with Defendant's guilty plea, is dispositive on this point:

(i)     Defendant admitted to nonconsensual sexual touching, rubbing, and ejaculation onto Plaintiff's body. Dkt. No. 46-1 at 14.

(ii)    the DNA Evidence Report provides that spermatozoa found on the vaginal and anal swabs taken from Plaintiff tested positive for Defendant's DNA. Dkt. No. 43-19 at 54.

(iii)   at Defendant's Deposition on June 24, 2024, he was asked: "[d]o you know what it means to sexually assault somebody?" to which Defendant answered that he did know, and that it means: "[w]hen you force yourself on someone without their consent." (Dkt. No. 43-17 at 64:6-11);

(iv)    at Defendant's Deposition on June 24, 2024, he was asked: "[w]hat is your understanding of a sexual touching?" to which he answered: "[w]hen you touch someone in a private area." He was then asked: "[a]nd it's intentional, right?" to which Defendant answered: "[y]es." (Dkt. No. 43-17 at 66:1-6);

(v)     at Defendant's Deposition on June 24, 2024, he was asked if he was attracted to Plaintiff, to which he responded, "[y]es." Defendant was then asked: "[a]nd you thought in your own head that [Plaintiff] was attracted to you?" to which Defendant answered: "[p]ossibly." (Dkt. No. 43-17 at 99:11-16).

(vi)    at Defendant's Deposition on June 24, 2024, the following exchange took place: Q: "Excuse me. Again I wasn't finished with my question. If she[23] said that, I don't recall hearing any words that said 'I want to have sex with you.'" Defendant answered: "[y]ou don't recall because she did not say that." (Dkt. No. 43-17 at 100:2-8).

(vii)   at Defendant's Deposition on June 24, 2024, he was asked to describe Plaintiff's demeanor on the night of the assault when the two were leaving the Hoboken bar,

---

[23] It is understood that the "she" being referred to is Plaintiff.

to which Defendant stated that Plaintiff "was drunk and sloppy like she is every night she's out." (Dkt. No. 43-17 at 104:24-25);

(viii) at Defendant's Deposition on June 24, 2024, Defendant was asked if, on the night of the assault, when leaving the bar with Plaintiff, he hoped to "engage in some sexual contact with her" to which Defendant replied: "I mean, I've hit on [Plaintiff] for years, I've always – I've made it known to her that I would have hooked up with [Plaintiff]." The clarifying question was then asked: "[t]hat you would have done what?" and Defendant stated: "[h]ooked up with [Plaintiff]. For years I made that known to her." Defendant was then asked what "hooking up" meant in his mind, and he replied: "[h]aving sex, making out, whatever you want to call it. She's a very pretty girl. Everyone liked her. If she wanted to, I would have absolutely been for it." (Dkt No. 43-17 at 107:15-108:3);

(ix) at Defendant's Deposition on June 24, 2024, Defendant was asked, "[Plaintiff] never before told you in any way, shape or form that she wanted to have sex with you despite the numerous times that you hit on her, right?" to which Defendant replied: "[c]orrect." (Dkt. No. 43-17 at 108:15-19);

(x) at Defendant's Deposition on June 24, 2024, Defendant was asked: "[y]ou were hoping to have sex with [Plaintiff], you were hoping to hook up with her?" to which Defendant replied: "[i]f she wanted to I would have been open to it." Defendant was then asked: "[b]ut did you intend on having sex with her when you took all your clothes off that night?" to which Defendant said, again, "[i]f she wanted to." (Dkt. No. 43-17 at 125:11-15, 128:15-17);

(xi) at Defendant's Deposition on June 24, 2024, Defendant was asked about prior allegations of sexual assault made against him, including an allegation that arose out of an incident in Belmar, New Jersey in the early 2010s. Defendant was asked if he was arrested in Belmar, to which he replied in the affirmative. The following series of questions and answers ensued: Q: "Did you go to jail?" A: "No." Q: "Were you put in jail?" A: "No. I was in a room." Q: "Where was the room?" A: "In Belmar." Q: "Where in Belmar? Was it at the beach?" A: "No. At the police station." Q: "Oh. Thanks. Belmar police station. Were you locked in the room?' A: "No." Q: "Could you leave whenever you wanted?" A: "No." (Dkt No. 43-17 at 69:25-70: 12).

(xii) at Defendant's Deposition on June 24, 2024, despite Defendant first claiming that he did not go to jail in Belmar, he later admitted: "I remember being taken to jail and having it dropped a few weeks later." (Dkt. No. 43-17 at 137:18-19). Defendant was further asked: "[s]o didn't you have to pay bail to get out of jail in Belmar?" to which he replied: "I did." Defendant also stated that his parents paid $15,000 to a bail bondsman to get him out of jail. (Dkt. No. 43-17 at 72:16-73:4). Defendant was also asked, still regarding the Belmar incident, about the specific accusation made against him. At first, Defendant stated that he "did not fully know" what the alleged victim accused him of, to which he was then asked to

55

state what he "partially" knew. Defendant replied: "I know it was a sexual contact thing and I was arrested." (Dkt. No. 43-17 at 138:24-139:4);

(xiii)    at Defendant's Deposition on June 24, 2024, he was asked: "[s]o do you feel that [if] there is not consent or absolute consent, that that still permits you to engage in sexual contact with another person?" to which Defendant replied: "[n]o." (Dkt. No. 43-17 at 72:12-15).

At the outset, it is important to note that the above-referenced prior allegation of sexual assault against Defendant is admissible under Federal Rule of Evidence 404(b)(2) for the permitted use of proving Defendant's knowledge, motive, intent, lack of accident, etc. Defendant's intent is directly at issue. Whether Defendant had knowledge that his conduct was substantially certain to result in injury to Plaintiff is directly at issue. Thus, the prior allegation of assault arising out of the Belmar incident is admissible under 404(b)(2) as to the issues of, *inter alia*, knowledge and intent.

This Court also finds, in the alternative, that the prior incident would likely meet Federal Rule of Evidence 413's definition of sexual assault, and would be admissible under Rule 415, as offered by Plaintiff. The fact that the charges against Defendant were dropped does not render such evidence inadmissible, as the legislative history to Rule 415 specifically states that uncharged conduct was intended to be included in the Rule. *See Johnson*, 283 F.3d at 151-52. However, the Court need not reach this conclusion because the evidence is admissible, for more precise reasons, under Rule 404(b)(2).

Although it is Defendant's position that he did not intend to injure Plaintiff and that he engaged in the nonconsensual sexual misconduct for his own personal sexual gratification, that is not dispositive of the issue, nor should it be. As highlighted by the cases cited above, a debtor is unlikely to admit to nondischargeable conduct. In evaluating intent, the Court is permitted and required to assess direct evidence, such as Defendant's guilty plea and admission that he (at

56

least) sexually touched, rubbed and ejaculated on Plaintiff without her consent, as well as circumstantial evidence of his prior conduct. This Court finds it directly relevant to the issues of knowledge, intent, and substantial certainty that Defendant had been previously held in police custody based on similar allegations. Defendant's prior involvement with law enforcement regarding a similar accusation is probative of his knowledge of the degree of wrongfulness and potential injurious consequences of his conduct.

Beyond his general knowledge of the wrongfulness of sexual assault, Defendant's expressed sexual interest in Plaintiff is also relevant and instructive. At Defendant's June 2024 deposition, he made repeated reference to his sexual interest in Plaintiff. Dkt. No. 43-17 at 107:15-108:3. He stated that he had made his attraction to Plaintiff known to her for "years" and repeatedly confirmed that if Plaintiff expressed interest in engaging in sexual intercourse with him that he would have "absolutely been for it." *Id*. at 107:15-25. Defendant revealed that he believed Plaintiff was "possibly" attracted to him. *Id*. at 99:11-16. However, Defendant acknowledged that Plaintiff had never before told him "in any way, shape or form" that she wanted to engage in sexual intercourse with him, even despite the "numerous times" that he "hit on her." *Id*. at 108:15-19. Defendant also explicitly acknowledged that Plaintiff never said the words "I want to have sex with you." *Id*. Defendant also expressed his perspective on Plaintiff's demeanor when she was under the influence of alcohol, stating that on the night of the assault, Plaintiff was "drunk and sloppy like she is every night she's out." *Id*. at 104:24-25.

In sum, Defendant was aware: (1) that Plaintiff exhibited noticeable behavioral changes during periods of alcohol consumption; (2) that he had been sexually attracted to Plaintiff for years; (3) that Plaintiff had never before responded positively to his repeated attempts to "hit on her"; (4) that sexually assaulting someone means forcing yourself upon them without their

consent; (5) that a lack of consent does not permit someone to engage in sexual contact with another person; and (6) that nonconsensual sexual conduct could result in potential criminal consequences. And yet, Defendant urges this Court to hold that he was *not aware* that sexually assaulting Plaintiff—either by penetrating her without her consent or sexually touching, rubbing and ejaculating on her body without her consent—was substantially certain to result in injury to her. While it is true that Defendant is entitled to all reasonable inferences at the summary judgment stage, this inference is simply not reasonable, and this Court so finds. To the contrary, this Court finds that no reasonable factfinder could conclude that Defendant was anything other than aware that injury was substantially certain to result by unlawfully coming into contact with sexually intimate areas of Plaintiff's body without her consent. That type of unlawful invasion of a person and her rights is more than substantially certain to cause injury, notwithstanding Defendant's claim that he did not intend to injure her.

Defendant offers no evidence in support of his contention that he did not intend to injure Plaintiff, beyond bald, self-serving assertions that he assaulted her for his own sexual gratification and that he did want to hurt her. Even assuming that to be true for purposes of these Motions, it is simply nonsensical that Defendant's own personal sexual enjoyment should allow him the benefit of a discharge where he acted on his professed sexual interest in Plaintiff without her consent, and admitted that it was a crime to do so. Further, Defendant's personal sexual gratification and his knowledge that sexual assault is substantially certain to result in injury to Plaintiff need not—and in this case, do not—exist exclusively of one another. Defendant may selfishly intend to be sexually gratified when he takes the injury-producing action, but that does not exclude this Court's independent finding, based on the direct and circumstantial evidence described above, that he was simultaneously aware that his actions were substantially certain to

58

result in injury to Plaintiff. Although Defendant admits that on the night of the assault he was

"emotionally compromised, selfish, reckless, narcissistic, irresponsible and uncaring," his

unwillingness to admit to knowing that injury is substantially certain to result from

nonconsensual sexual contact with a woman incapable of providing consent, does not create a

genuine dispute of fact for trial. Therefore, it is this Court's determination that Plaintiff has

provided sufficient evidence to eliminate any genuine dispute of material fact as to Defendant's

subjective intent to injure.[24]

This Court finds that by Defendant's actions—the unlawful touching of Plaintiff's

sexually intimate parts through either penetration or touching, rubbing and ejaculation in or on

Plaintiff without her consent—and his knowledge that alleged or actual unlawful sexual contact

can (and did) lead to severe adverse consequences (including a night in jail), Defendant was

subjectively aware that his misconduct was substantially certain to result in injury to Plaintiff and

her legally protected right to be free from such criminal sexual conduct. Accordingly, there is no

genuine dispute of material fact as to Defendant's willful intent to cause injury.

C.  Malice

Because courts in the Third Circuit analyze "willful" and "malicious" as separate,

distinct elements, Plaintiff is entitled to summary judgment only if she can prove that Defendant's

conduct was also malicious. Malice is defined as a wrongful act, done intentionally, without just

cause or excuse. *See, e.g., Picard*, 640 B.R. at 553; *see also Conte*, 33 F.3d at 308. An injury may

be malicious under § 523(a)(6) "even in the absence of personal hatred, spite or ill-will." *Conte* 33

---

[24] Even though Plaintiff argued her entitlement to summary judgment under the objective standard, the subjective standard is more exacting. Thus, this Court's finding that there is no genuine dispute of material fact as to Defendant's subjective intent to injure would necessarily also fulfill the objective standard if, in fact, that standard were to be adopted in this Circuit.

F.3d at 308. Thus, Plaintiff need not show specific malice. *Id*. Implied malice is sufficient for purposes of § 523(a)(6). *See, In re Bayer*, 521 B.R. 491, 501 (Bankr. E.D. Pa. Dec. 2, 2014) ("Malice may be established by the debtor's actions as well as the surrounding circumstances.").

Plaintiff argues that injury suffered as the result of an intentional sexual tort is inherently malicious. Dkt. No. 43-2, ¶ 28-29. This Court agrees. Moreover, Defendant's Motion did not directly address the malice prong. Instead, in support of Defendant's SJM, Defendant argued that he lacked the requisite intent to injure under the willful prong of § 523(a)(6)—he did not make a similar claim under the malice prong. Dkt. No. 46 at 34. There is, therefore, no dispute of fact on this issue. Further, under either scenario—the penetration alleged by Plaintiff or the sexual touching, rubbing and ejaculation acknowledged by Defendant—it is clear that Defendant's conduct was wrongful and done without justification or excuse. In fact, it was a crime. Defendant's statements that he never meant to hurt Plaintiff are of no avail. For purposes of § 523(a)(6), Defendant's nonconsensual criminal sexual contact with Plaintiff can be, and in this case is, malicious "even in the absence of personal hatred, spite, or ill-will." *Conte*, 33 F.3d at 308.

As explained above, this Court finds that Defendant acted intentionally, willfully, and maliciously. Defendant has not offered, and this Court cannot ascertain, any just cause or excuse for Defendant's deplorable criminal conduct. Thus, there is no genuine dispute of material fact as to the issue of Defendant's malice.

## VIII.   CONCLUSION

For the foregoing reasons, the Court finds that there exists no genuine dispute of material fact as to the dischargeability of any to-be-determined debt owed to Plaintiff by Defendant as a result of the willful and malicious injury he inflicted upon her on September 10, 2021. Based on the record before this Court, no reasonable factfinder could determine otherwise.

Plaintiff is therefore entitled to summary judgment, and her Cross-Motion is hereby GRANTED.

Defendant is not entitled to summary judgment for all the reasons summary judgment is

appropriate in favor of Plaintiff. Defendant's Motion for summary judgment must therefore be

DENIED.

July 21, 2026

Vincent F. Papalia, U.S.B.J.